United States District Court
Southern District of Texas
**ENTERED**
September 03, 2025
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CONSTANCE JOY II, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:20-CV-02967** |
| | § | |
| **STEWART & STEVENSON FDDA LLC,** | § | |
| **d/b/a FLORIDA DETROIT** | § | |
| **DIESEL-ALLISON,** | § | |
| | § | |
| **Defendant.** | § | |

## FINDINGS OF FACT AND CONCLUSION OF LAW

Plaintiff Constance Joy II, LLC ("Plaintiff") was the ultimate interest owner of a 125-foot Benetti F125 motor yacht called the Constance Joy (the "Yacht"). The Yacht had two engines built by Rolls-Royce Solutions GmbH—formerly MTU Friedrichshafen GmbH ("MTU")[1]—a subsidiary of Rolls-Royce Power Systems, AG ("Rolls-Royce"). In April 2018, the Yacht's engines began to overheat. The Yacht's captain and chief engineer performed a sea trial on or about May 24, 2018, at which time the Yacht's engines failed. Defendant Stewart & Stevenson FDDA LLC, doing business as Florida Detroit Diesel-Allison ("FDDA"), was called to service the engines. The services included removing

---

[1]     MTU Friedrichshafen GmbH was renamed Rolls-Royce Solutions GmbH in late 2019. Wolfgang Boller, *Rolls-Royce Power Systems Business Unit to Restructure its Brands*, mtu Sols.: mtu Stories (Aug. 6, 2019), https://www.mtu-solutions.com/cn/en/stories/company/news/rolls-royce-power-systems-business-unit-to-restructure-its-brands.html.     Because the entity was known as MTU Friedrichshafen GmbH during the relevant period and the Parties refer to it by this name in their filings, (*see, e.g.*, Dkt. No. 138 at 9), the Court does the same and uses "MTU" to refer to the entity that built the Yacht's engines.

certain engine cooling hoses to access, inspect, and clean the engines' heat-exchanger plates.

In August of 2018, another sea trial was performed by the Yacht's captain and chief engineer. During the sea trial, the Yacht sustained damage after one of the engine's cooling hoses broke loose and sprayed seawater throughout the Yacht's engine room. Plaintiff sued FDDA, alleging that FDDA negligently failed to tighten the cooling hoses when it reinstalled the heat-exchanger plates.

FDDA denies Plaintiff's allegations and asserts affirmative defenses. FDDA contends that Plaintiff's negligence claim is barred because the Yacht's captain signed a Service Repair Order ("SRO") that limits damages, and Plaintiff is bound by that signature under the doctrine of apparent authority. FDDA also argues that Plaintiff's damages resulted from its own negligence. Plaintiff disputes both points, asserting that the Yacht's captain lacked any authority—express or otherwise—to bind it to contractual terms with FDDA, and arguing that Plaintiff did not negligently cause its own damages.

## I.     FINDINGS OF FACT[2]

The Court finds that the following facts have been established by a preponderance of the evidence. Any finding of fact that should be construed as a conclusion of law is adopted as such.

---

[2]     The Parties submitted Joint Proposed Findings of Fact and Conclusions of Law. (Dkt. No. 172). There, the Parties agreed to certain findings and conclusions. (*See id*. at 1). The agreed findings and conclusions are marked with the notation "[Agreed]" at the end of each paragraph.

A. THE PARTIES

1. Plaintiff Constance Joy II, LLC is a Delaware limited-liability company that does business in Broward County, Florida. [Agreed]

2. Plaintiff was the ultimate interest owner of a 125-foot Benetti F125 motor yacht called the Constance Joy (the "Yacht"), which is the subject matter of this lawsuit. (Dkt. No. 181 at 67–68); (*see also* Dkt. No. 180 at 84–85, 87–88); (Dkt. No. 174 at 116–17).

3. Defendant Stewart & Stevenson FDDA LLC is a Delaware limited-liability company doing business as Florida Detroit Diesel-Allison ("FDDA"). FDDA is an engine parts and services company, and an authorized distributor and approved service provider for MTU America Inc., doing business in and maintaining offices in Broward County, Florida. [Agreed]

B. THE PURCHASE AND OWNERSHIP OF THE YACHT

4. Barry Skolnick ("Skolnick") is the sole member of Plaintiff Constance Joy II, LLC, which in turn owns all outstanding shares of Constance Joy II, Limited, which in turn held the ownership interest of the Yacht at the time of the incident giving rise to this lawsuit. [Agreed]

5. Skolnick has been a resident of Florida since 2014. His current address is 4775 Collins Avenue, Miami Beach, Florida. (Dkt. No. 180 at 72). [Agreed]

6. Skolnick has been boating for close to 40 years. (Dkt. No. 174 at 33).

7. Skolnick contracted for the purchase and construction of the Yacht from Azimut Benetti ("Benetti") in August 2014. (Dkt. 138 at 9) (Admission of Fact #3); (Dkt. No. 180 at 77); (JX1) (contract). The contract price was $15,350,000. (Dkt. No. 180 at 78); (JX1) (contract); (Dkt. No. 138 at 9) (Admission of Fact #3). [Agreed]

8. Skolnick purchased the vessel through a yacht broker called Marine Max. Skolnick's point of contact at Marine Max was Bob Fritzky ("Fritzky"). (Dkt. No. 180 at 77–78). [Agreed]

9. Skolnick was the first owner of the Yacht. (*Id.* at 77). Skolnick named the vessel after his mother, Constance. (*Id.* at 71). [Agreed]

10. In 2014, the Yacht was just in renderings and drawings. It still had to be built. The Yacht was constructed from Hull Number 2 at Benetti. (*Id.* at 77). [Agreed]

11. Skolnick was involved in the construction process. (Dkt. No. 174 at 54).

12. Skolnick made several trips to Italy during the build. (*Id.*). He hired a build captain and surveyor to facilitate and oversee the construction. (Dkt. No. 138 at 9)

(Admission of Fact #4); (Dkt. No. 180 at 79–81).  Skolnick shared the expense of the build captain with a friend named Tracy Maitland ("Maitland"), who was building a "sister vessel" to the Yacht with Hull Number 3.  (Dkt. No. 180 at 80).  [Agreed]

13.    A "sister vessel" is a "yacht that's the exact same model and make as [the Yacht at issue]." (Dkt. No. 182 at 10).  Maitland named his boat the "Skylar" after his daughter.  (Dkt. No. 180 at 83).  The Skylar is a "sister vessel" to the Yacht and is currently called the "Deliberately Lucky."  (Dkt. No. 182 at 10).  [Agreed]

14.    The construction process for the Yacht took three years to complete.  (Dkt. No. 180 at 82).  While various issues arose during the construction, they were addressed with no major concerns.  (*Id.*).  Skolnick was pleased with the finished product.  (*Id.*). [Agreed]



15.    The Yacht had two engines built by MTU Friedrichshafen GmbH, a subsidiary of Rolls-Royce Power Systems, AG.  (Dkt. No. 138 at 9) (Admission of Fact #5); (Dkt. No. 181 at 139); (Dkt. No. 175 at 25–26); (Dkt. No. 182 at 29).  [Agreed]

16.    The Yacht was calculated to do 24 knots, which is really fast for a boat of this size.  (Dkt. No. 180 at 76).  [Agreed]

17.    The engines for the Yacht were covered by an MTU Warranty.  (Dkt. No. 138 at 9) (Admission of Fact #6); (Dkt. No. 180 at 82–83).  [Agreed]

18.    Skolnick also negotiated with Benetti for a five-year, bumper-to-bumper warranty on the vessel from Benetti.  (Dkt. No. 180 at 82–83).  [Agreed]

19. The vessel was insured through typical liability and casualty insurance. (*Id.* at 84). [Agreed]

20. Skolnick established a corporate structure to manage and hold the Yacht based on legal advice from a law firm in Palm Beach that specializes in boats. (Dkt. No. 174 at 52). [Agreed]

21. Constance Joy II, LLC was formed in July 2016 as the management company of the Yacht. (Dkt. No. 180 at 84, 93); (JX4) (certificate of formation LLC). [Agreed]

22. Skolnick does not believe he signed a contract with Constance Joy II, LLC to serve as manager of the Yacht. (Dkt. No. 174 at 94:1–8). [Agreed]

23. Skolnick is the sole member of Constance Joy II, LLC. (Dkt. No. 180 at 85). [Agreed]

24. The home office for Constance Joy II, LLC is Skolnick's apartment at 4775 Collins Avenue, Miami Beach, Florida. (Dkt. No. 175 at 20). [Agreed]

25. The registered agent for Plaintiff is Agents and Corporations Inc., 1201 Orange Street, Suite 600, Wilmington, DE 19801. (Dkt. No. 138 at 9) (Admission of Fact #1). [Agreed]

26. Constance Joy II Limited was formed as a Marshall Islands company in June 2017 to be the holding company of the Yacht. (Dkt. No. 180 at 85–88); (JX10) (certificate of incumbency). [Agreed]

27. Constance Joy II Limited did not enter into a management agreement with Constance Joy II, LLC. (Dkt. No. 174 at 93:22–94:8). [Agreed]

28. Skolnick is the president, secretary, and sole director. (Dkt. No. 180 at 87–88); (JX10) (certificate of incumbency). [Agreed]

29. Constance Joy II, LLC is the sole shareholder of Constance Joy II, Limited. (Dkt. No. 180 at 88); (JX10). [Agreed]

30. Ultimately, the owner of the Yacht was Skolnick. (Dkt. No. 174 at 93). He chose a corporate structure to manage and hold the Yacht, as opposed to owning the boat directly, to protect against personal liability. (Dkt. No. 180 at 85–86).

31. Aaron Fischer ("Fischer") serves as the Chief Financial Officer ("CFO") of Skolnick's various businesses, including BLS Asset Management; Constance Joy II, LLC; Constance Joy II, Limited; and other businesses owned by Skolnick. (*Id.* at 76); (Dkt. No. 181 at 66, 69); (Dkt. No. 138 at 9) (Admission of Fact #2). [Agreed]

32.    According to Skolnick, Fischer is a long-time, trusted, and loyal employee who has worked for Skolnick since 2014.  (Dkt. No. 180 at 76); (Dkt. No. 181 at 65).  [Agreed]

33.    Fischer's duties and responsibilities for the Yacht mainly involved the financial affairs of the boat.  (Dkt. No. 181 at 69).  Fischer took care of all the billings and expenses for the Yacht, and he interfaced with the crew and management company for the Yacht, called Burgess Yachts.  (Dkt. No. 180 at 76).  [Agreed]

## C.    INITIAL DELIVERY AND MAIDEN VOYAGE

34.    On July 15, 2016, Benetti conducted an initial sea trial of the Yacht in Italy. (*Id.* at 89–90); (JX121 at 2).  No major issues were reported.  (DX1 at 90).  [Agreed]

35.    A sea trial is a test where the vessel undergoes maneuvers that simulate the stresses a vessel is expected to experience while at sea, including operating the vessel at high Revolutions Per Minute ("RPMs").  (Dkt. No. 175 at 24).  [Agreed]

36.    On August 26, 2016, Benetti performed a second sea trial in Italy and reached speeds of 22 knots.  (Dkt. No. 180 at 90); (JX121 at 3).  Skolnick attended the second sea trial in August 2016.  (Dkt. No. 180 at 90).  [Agreed]

37.    In June 2017, Skolnick took delivery of the Yacht in Viareggio, Italy, and began preparing for a maiden voyage.  (*Id.* at 88, 91); (JX121 at 4); (Dkt. No. 138 at 9) (Admission of Fact #8).  [Agreed]

38.    The maiden voyage was around the Mediterranean for 73 days.  (Dkt. No. 180 at 91–92); (Dkt. No. 138 at 9) (Admission of Fact #9).  [Agreed]

39.    The Yacht was crewed by a full crew with the assistance of Burgess and Benetti.  (Dkt. No. 180 at 91–92).  The Yacht cruised through the voyage at varying speeds from 10 to 12 miles per hour.  (*Id.* at 92).  [Agreed]

40.    No major issues were experienced during the maiden voyage, including no mechanical issues, no stranding issues, and no issues that required an emergency SOS call.  (*Id.* at 92–93).

41.    After the maiden voyage, the Yacht returned to the Viareggio shipyard for a month or two to address a punch list of issues that needed attention.  (*Id.* at 93).

42.    In December 2017, the Yacht was transported to Florida by vessel.  (*Id.* at 85–96); (JX121 at 6–7); (JX43) (Burgess email showing Constance Joy set to arrive in December 2017); (Dkt. No. 138 at 9) (Admission of Fact #9).  There were no major issues experienced during the transfer process.  (Dkt. No. 180 at 96).  [Agreed]

**D.    MANAGEMENT, STAFFING, AND CHARTERING OF THE YACHT**

43.    Prior to taking delivery of the Yacht in Florida, Skolnick had preliminary exchanges with Nigel Burgess Limited ("Burgess") about the management and staffing of the Yacht, (*id.* at 97–102), which led to a signed Crew Management Agreement dated February 16, 2018, (JX13), and a signed Yacht Management Agreement dated March 1, 2018, (JX14).  Although Burgess initiated discussions related to the entry of the Yacht into the Burgess chartering pool, Skolnick never signed any agreement with Burgess to manage the chartering of the Yacht.  (Dkt. No. 174 at 105–10).

44.    Burgess is one of many management/charter companies for yachts.  (Dkt. No. 180 at 96–97).  Skolnick learned about Burgess through his friend Maitland who was using Burgess to manage the Skylar.  (*Id.*).  Skolnick found Burgess to be very professional.  (*Id.* at 97).  Skolnick's primary point of contact at Burgess was Charmaine du Plessis ("Plessis").  (*Id.* at 102).  [Agreed]

**1.    Burgess Chartering**

45.    The Yacht was classed as a pleasure yacht with the Jamaican Flag Administration, and it did not carry commercial charter insurance.  (Dkt. No. 174 at 50, 51).  There were no projections or estimates of anticipated charter income prepared when Plaintiff bought the Yacht.  (Dkt. No. 181 at 65).

46.    Beginning in March 2017, before taking delivery of the Yacht, Skolnick and Plessis began to exchange emails about the Burgess charter program.  [Agreed]

47.    On March 22, 2017, Plessis sent Skolnick an email with a market overview, projected charter rates, and a Central Agency Charter Agreement.  (Dkt. No. 180 at 103, 105–110); (JX42).

48.    Despite testifying that he believed there was demand for chartering the Yacht in the Bahamas and stating at trial that he planned to do so, Skolnick never responded to Burgess or signed a Central Agency Charter Agreement.  (Dkt. No. 180 at 107, 109–10).  His plans remained purely prospective.  (Dkt. No. 174 at 104:21-24).

49.    On April 3, 2017, Plessis followed up with Skolnick regarding the March 2017 charter proposal, stating that Burgess was "keen to move forward."  (Dkt. No. 180 at 110); (JX49).  [Agreed]

50.    Skolnick neither responded to nor signed the 2017 charter proposal that Plessis at Burgess provided.  (Dkt. No. 174 at 105:2-8, 106:16-17).

51.    On November 17, 2017, Plessis followed up again, stating that Burgess is "thrilled" the Yacht will be arriving in Florida in December 2017, and that it will be available to charter in the Bahamas.  (Dkt. No. 180 at 111); (JX43).  Plessis also expressed

that Burgess "expect[s] the yacht to be extremely popular" and that "SKYLAR had a tremendous reception this past summer in the Med[iterranean] and again at the recent FTL Boat Show." (JX43). [Agreed]

52.    Skolnick neither responded to nor signed any charter management agreement in response to the November 17, 2017, email. (Dkt. No. 174 at 105:9–106:17).

53.    On November 17, 2017, Plessis emailed again, advising Skolnick and Fischer that when they are ready to move forward with the charter arrangement, then Burgess will need various information, such as the "Owning company name and address" to draw up the Charter Central Agency Agreement. (Dkt. No. 180 at 113–15); (JX41). [Agreed]

54.    Skolnick did not respond to and did not sign any charter-management agreement in response to this second November 17, 2017, email. (Dkt. No. 174 at 105:9-17–106:16-17).

55.    The Yacht Charter Central Agency Agreement included at Clause 5, "Charter Agreements: The Owner agrees to use the current MYBA Charter Agreement for all charters unless otherwise specifically requested." (JX46 at ¶ 5). [Agreed]

56.    On November 17, 2017, Plessis emailed a third time, confirming her discussion with Skolnick and Fischer just moments earlier about the charter proposal and a "suggested list of basic toys" for the Yacht. (Dkt. No. 180 at 115); (JX44). The suggested toys included items such as jet skis, Seabobs, kayaks, water skis, wakeboards, snorkeling gear, etc. (JX44 at 2). Skolnick had several toys on board the Constance Joy, including specifically a Williams tender and a jet ski. (Dkt. No. 180 at 115–16). [Agreed]

57.    Skolnick was also looking to purchase other toys, including a blowup slide, kayaks, wakeboards, scuba equipment, and other items of that nature. (*Id.* at 116); (Dkt. No. 174 at 111). [Agreed]

58.    Skolnick did not purchase the required additional "life raft or two" or any of the other toys suggested by Burgess for chartering the Yacht that Skolnick did not already have. (Dkt. No. 174 at 101:4–102:12). [Agreed]

59.    On January 2, 2018, Plessis emailed Skolnick acknowledging her understanding that the Constance Joy was "ready to go for charter! This is great news." (JX40); (Dkt. No. 180 at 116–17). [Agreed]

60.    The January 2, 2018, email attached a sample Yacht Charter Central Agency Agreement and reminded Skolnick that Plessis still needed the owning company name of the Yacht so that she could complete the agreement. (JX40); (Dkt. No. 180 at 116–17). [Agreed]

61.     Skolnick did not sign the Yacht Charter Central Agency Agreement sent on January 2, 2018.  (Dkt. No. 174 at 105–06).

62.     On January 4, 2018, another representative from Burgess sent Skolnick and Fischer a completed Charter Central Agency Agreement, which Burgess had already initialed and signed.  (Dkt. No. 180 at 118–19); (JX48).  [Agreed]

63.     Skolnick did not sign the Yacht Charter Central Agency Agreement sent on January 4, 2018.  (Dkt. No. 174 at 105–06).

64.     On March 26, 2018, Plessis emailed Skolnick, confirming their meeting earlier that morning on the Yacht and attaching another completed Charter Central Agency Agreement with an updated signature from Burgess.  (Dkt. No. 180 at 119); (JX46).  [Agreed]

65.     Skolnick did not sign the Charter Central Agency Agreement sent on March 26, 2018.  (Dkt. No. 174 at 106–10).

66.     Plessis also included other materials related to chartering the Yacht and remarked that Burgess is "very excited to get the ball rolling."  (Dkt. No. 180 at 119); (JX46).  [Agreed]

67.     On March 26, 2018, Plessis emailed Skolnick a second time to advise that a photo shoot and video quote had been requested for the Yacht in the Bahamas.  (Dkt. No. 180 at 120–21); (JX45).  The photo shoot was related to the promotional pamphlets and video that Burgess would use to market the Yacht for charter.  (Dkt. No. 180 at 121). [Agreed]

68.     The Yacht never went to the Bahamas to have a photo shoot done and never had a promotional video shot on board the vessel in the Bahamas or anywhere else. Burgess never made any promotional materials that incorporated photos or videos of the Yacht.  (Dkt. No. 174 at 102:17–103:4).  [Agreed]

69.     On March 27, 2018, Skolnick forwarded Plessis's March 26th email to Fischer and asked him to "[p]lease review this and get back to me ASAP."  (JX50 NonPartyBurgess-000108).  [Agreed]

70.     On March 29, 2018, Fischer emailed Plessis with a list of various follow-up questions regarding the terms of the proposed Charter Central Agency Agreement and other considerations for chartering the Yacht.  (*Id.*) (NonPartyBurgess-000107–08). [Agreed]

71.     On April 2, 2018, Plessis responded to Fischer with answers and comments to Fischer's questions in "red" text.  (*Id.*).  Among the comments provided by Plessis were (i) that the proposed charter rates for the Yacht were "based on the current comparable

yachts on the charter market [including the Skylar], which would make CJ [Constance Joy] a competitive charter yacht"; and (ii) yachts chartered in the "Bahamas/Caribbean" do not need to be "commercial" and could charter on a "privet registration."  [Agreed]

72.     A few weeks later, on April 13, 2018, Plessis sent a follow-up email to Skolnick and inquired if he had "further questions on the Charter Central Agency Agreement (attached)? We are keen to start work on the charter end of things so we are ready to market for the season."  (Dkt. No. 180 at 122); (JX50).  The email attached a copy of the Charter Central Agency Agreement, which had been sent to Skolnick on March 26, 2018, with Burgess's signature. (JX50).  [Agreed]

73.     Skolnick did not sign the Yacht Charter Central Agency Agreement at any point between March 22, 2017, and August 24, 2018, stating that he wanted his lawyer to review it.  (Dkt. No. 174 at 103–12).  Skolnick explained that there were "certain issues that needed to be cleared up," but never provided further evidence on the point.  (*Id.*).  But when asked to sign the crewing and management agreement for Burgess to operate and staff the Yacht, he signed promptly.  (*Id.*).

74.     Skolnick testified that he could have signed the Yacht Charter Central Agency Agreement "the very next day" after August 24, 2018.  (*Id.* at 121:1–5).  But the record contains no evidence that—after 520 days of delay—he ever intended to do so. (*See id.* at 109:5–114:2).

75.     The Court finds that the record contains no evidence of a signed agency agreement between Burgess and either Plaintiff or Skolnick authorizing the marketing of the Yacht for charter to third parties.  Nor is there any evidence that Skolnick intended to charter the Yacht, as he made no effort to do so during the peak Bahamas charter season from December 2017 to April 2018.  (*Id.* at 112:14–114:2).  During the time that Constance Joy II, Limited owned the Yacht, the vessel was never chartered to a third party.  (Dkt. No. 181 at 112:2-3).

## 2.    Burgess Management and Staffing

76.     Skolnick, through Constance Joy, II, Limited, entered into a Crew Management Agreement with Burgess on February 16, 2018, (JX13), and a Yacht Management Agreement on March 1, 2018, (JX14).

77.     On February 16, 2018, Skolnick engaged Burgess for crew-management services to operate the Yacht, including a captain, engineer, chef, first mate, and stewardesses.  (Dkt. No. 180 at 98–99).  A Standard Crew Management Agreement was signed between Constance Joy II, Limited, a wholly owned subsidiary of Constance Joy II, LLC, and Burgess Crew Services.  (JX13) (listing positions and pay); (Dkt. No. 138 at 9) (Admission of Fact #10).  [Agreed]

78.    On March 1, 2018, Skolnick engaged Burgess for management of the crew as well as the Yacht as to its systems and making sure there was record keeping relative to maintenance.  (Dkt. No. 180 at 97–98).  [Agreed]

79.    A Yacht Management Agreement was signed between Constance Joy II, Limited and Nigel Burgess Limited, effective on or about March 15, 2018.  (JX14); (Dkt. No. 138 at 10) (Admission of Fact #11).  [Agreed]

80.    On March 8, 2018, Burgess hired Anthony Nicholls, as captain, and Anthony Waugh, as chief engineer, each of whom signed separate employment contracts with Burgess.  (JX11) (Captain contract); (JX12) (Engineer contract); (Dkt. No. 138 at 10) (Admission of Fact #12).  [Agreed]

81.    Captain Nicholls explained that "the reason I came back to get on this vessel at 125 feet was because in the same conversation it came out well its 125 feet, but he's gonna be building a 200 foot plus yacht."  (JX82 at 60:4–7) (Captain Dep.).  Captain Nicholls described this as the carrot for taking the job as captain of the Yacht.  (*Id.* at 62–63).  [Agreed]

82.    Captain Nicholls agreed to join the Yacht as Captain after exchanging a series of emails and messages with Bob Fritzky and Fischer.  (*Id.* at 64–65).  Fritzky had learned of Captain Nicholls through Benetti, which knew of Captain Nicholls as a good operator.  (*Id.* at 64).  Captain Nicholls did not speak with Fischer before flying from Australia to Florida to work on board the Yacht.  (*Id.* at 65).  [Agreed]

83.    Captain Nicholls made the initial call to Engineer Waugh for interest in joining the Yacht as chief engineer because he is a highly qualified engineer and is familiar with high horsepower machinery.  (*Id.* at 133–37) (Captain Dep.); (JX83 at 29–33) (Engineer Dep.).  [Agreed]

84.    Both Captain Nicholls and Engineer Waugh signed the last page of their employment contracts with Burgess, following 14 paragraphs of terms and conditions. (JX11); (JX12); (Dkt. No. 174 at 144).  [Agreed]

85.    Both contracts expressly disclaim any actual authority for either of them to contract on behalf of the vessel owner.  Specifically, both employment contracts contain the following provision regarding authority: "The Seafarer [Captain Nicholls or Engineer Waugh] shall not have any right or power to bind the Employer, any agent or owner, to any engagement, obligation or contract."  (JX11 ¶ 14.14) (Captain contract); (JX12 ¶ 14.14) (engineer contract); (Dkt. No. 138 at 10) (Admission of Fact #13).  [Agreed]

86.    Captain Nicholls initially agreed to serve as captain of the Yacht for $125,000 per year, but Fischer attempted to renegotiate at the Miami Boat Show and offered $9,000 per month.  (JX82 at 74–75) (Captain Dep.).  [Agreed]

87.    It became evident early on for Captain Nicholls that there was no intention to build a bigger boat, so he decided not to stay on beyond his initial contract term (approximately six months).  (*Id.* at 76–77, 111).  [Agreed]

88.    Neither Captain Nicholls nor Engineer Waugh initialed any of the pages of their respective employment agreements and did not initial any of the clauses limiting their authority.  (Dkt. No. 174 at 136–40); (JX11); (JX12).  [Agreed]

89.    Similarly, Burgess did not initial each page of the employment agreements. (JX11); (JX12).  [Agreed]

90.    Skolnick approved of Burgess's hiring of Captain Nicholls and Engineer Waugh to operate the vessel.  (Dkt. No. 174 at 126).  [Agreed]

91.    Captain Nicholls testified that he complied with the obligations from this employment contract with Burgess to honestly, faithfully, and diligently perform his duties with care and skill, and to use best endeavors to promote the interest and reputation of the boat.  (JX82 at 117–18) (Captain Dep.).  [Agreed]

92.    Engineer Waugh also testified that he complied with his duty and obligation to honestly, faithfully, and diligently perform his duties with care and skill, and regulations issued from time to time by the master, the manager's representatives and the employer, and he never received any complaints about his performance.  (JX83 at 43) (Engineer Dep.).  [Agreed]

93.    Engineer Waugh knew that Skolnick owned the boat and met him while working on board.  (JX83 at 17–18) (Engineer Dep.).  Engineer Waugh knew that Aaron Fischer was the "accounts manager" for the vessel and he spoke with him on the phone once or twice.  (*Id.* at 18–19).  [Agreed]

94.    Engineer Waugh never heard of Constance Joy II, LLC and was not aware of Constance Joy II, Limited.  He knew Captain Nicholls for twenty-two (22) years.  (*Id.* at 20–21) (Engineer Dep.).  [Agreed]

95.    Captain Nicholls believed everything, document-wise, appeared to be in order when he joined the Yacht.  (JX82 at 91) (Captain Dep.).  [Agreed]

96.    There was a safety-management system on board, which was implemented by Burgess.  (*Id.* at 119); (JX83 at 44) (Engineer Dep.).  There was a manual for the defense system on board and the propulsion system.  (JX83 at 59) (Engineer Dep.).  [Agreed]

97.    There was a bridge logbook maintained by Captain Nicholls or the first mate.  (*Id.* at 51).  Any major work that was done was recorded in the Yacht's computer as well as a Word file.  (*Id.* at 52).  [Agreed]

98.     Captain Nicholls requested and received a letter of authority and testified, "the Letter of Authority gives me the power to take—make decisions on the vessel as master of the vessel because until I receive that those responsibilities lie with someone else." (JX82 at 96, 97:12–17) (Captain Dep.).  [Agreed]

99.     Captain Nicholls was the highest-ranking crew member and was responsible for navigation, safety of crew, property, passengers, and vessel.  (*Id.* at 98–99).  [Agreed]

100.     When Engineer Waugh joined the vessel, it did not have a planned maintenance system or schedule in place, so Engineer Waugh created a maintenance schedule and checklist during his time.  (JX83 at 59, 94) (Engineer Dep.); (Dkt. No. 176 at 28).  [Agreed]

101.     Engineer Waugh reported that there was no engineer previously on board, there were no records or logs kept on board when he joined, so he created his own.  (JX83 at 48–51) (Engineer Dep.).  [Agreed]

102.     There was not an engineer working on board when Engineer Waugh arrived at the Yacht, and it had to be towed to the Miami Boat Show at Collins Avenue.  (JX82 at 91–93) (Captain Dep.).  [Agreed]

103.     Engineer Waugh testified that the Yacht had not been correctly maintained before he joined.  The strainers were completely blocked, the fuel system was dirty, and the fuel was "very, very dirty."  (JX83 at 46–47, 52:24–25) (Engineer Dep.).  [Agreed]

104.     When Engineer Waugh joined the Yacht, he was given no familiarization training, was provided no instructions related to any jobs that were outstanding to be completed, and there was no planned maintenance program.  (*Id.* at 48–51, 58:20-23).  [Agreed]

105.     The main engines were not operational when Engineer Waugh began working on the Yacht.  (*Id.* at 50:22-25).  Furthermore, the "vessel never went anywhere so there was no running log."  (*Id*. at 52:4–5).  [Agreed]

106.     Burgess managed the paperwork for the vessel.  (*Id.* at 36).  [Agreed]

107.     Despite Burgess managing the paperwork for the Yacht, Engineer Waugh was given no instructions about any outstanding jobs to be completed when he joined the Yacht.  (*Id.* at 52).  [Agreed]

108.     General custom and practice is that ship records, including deck logs, oil-record books, and engineering logs stay with the vessel.  (JX82 at 105) (Captain Dep.).  FDDA's expert Pierce Power ("Power") agrees.  (Dkt. No. 176 at 79–80).  [Agreed]

109.    Electronic and/or paper copies of engine-room logs, deck logs, visitor logs, and other shipboard records are made and sent to a managing agent or shoreside agent such as Burgess pursuant to standard shipboard custom and practice.  (*Id.* at 79:21–80:6).  [Agreed]

110.    Skolnick primarily looked to Fischer to interface with Burgess, Captain Nicholls, and Engineer Waugh on day-to-day matters, and to review invoices and approve payment of expenses, including crew pay through the Burgess contracts.  (Dkt. No. 180 at 101); (Dkt. No. 181 at 17–18).  [Agreed]

111.    Fischer was also the primary point person who communicated with Captain Nicholls regarding expenses for the Yacht.  (Dkt. No. 181 at 18).  [Agreed]

112.    Captain Nicholls was given a Visa credit card for the Yacht.  (*Id.* at 89); (JX82 at 182) (Captain Dep.).  [Agreed]

113.    Skolnick and Fischer discussed a protocol for Captain Nicholls obtaining approval for any expenses over $500, and Fischer communicated that requirement to Captain Nicholls.  (Dkt. No. 181 at 18, 76); (JX82 at 117, 182) (Captain Dep.).  [Agreed]

114.    The credit-card billing address was listed as 410 Ocean Avenue, Lynbrook, NY 11563, not Skolnick's residence and home office at 4775 Collins Avenue, Miami Beach, Florida.  (*See* JX20); (Dkt. No. 180 at 72:1–4).  [Agreed]

115.    Engineer Waugh would put in a request for third-party service providers and authorization was "up to the Captain's discretion." (JX82 at 63) (Engineer Dep.).  [Agreed]

116.    Captain Nicholls testified that he did not have the authority to employ anyone without contacting either Fischer or Burgess, and any expense over $500 had to first be approved by Fischer.  (*Id.* at 134, 182).  [Agreed]

117.    Captain Nicholls explained "it was a battle getting any sort of cash or anything for any works to be done on that vessel."  (*Id.* at 117:18–20) (Captain Dep.).  It was a battle to get $500–$1000 for petty cash despite previously being in charge of 400k Euros and six credit cards on other boats.  (*Id.* at 183).  [Agreed]

118.    Engineer Waugh was the most senior crew member in the engine department but reported to the Captain and received authorization from the Captain for everything he did, testifying that "everything that I did went through the captain."  (JX83 at 56–57) (Engineer Dep.).  [Agreed]

### E.    FDDA'S WORK ON THE YACHT

119.    FDDA is the exclusive service company for MTU engines in South Florida. (Dkt. No. 175 at 9–10); (Dkt. No. 138 at 9) (Admission of Fact #7).  [Agreed]

120.    From February 2018 to April 2018, the Yacht was tied up at RMK Merrill-Stevens shipyard for warranty and other repair work.  (JX78); (JX82 at 143) (Captain Dep.).  [Agreed]

121.    The Yacht was never chartered either before or after the Miami Boat Show in February 2018 and was not actively used by Skolnick when it was tied up at the Merrill-Stevens Shipyard.  (JX82 at 143) (Captain Dep.).  [Agreed]

122.    Beginning in April 2018, Captain Nicholls and Engineer Waugh began to experience engine issues on the Yacht.  (Dkt. No. 138 at 10) (Admission of Fact #14).  [Agreed]

123.    Captain Nicholls understood the vessel was new and had new engines, which were under warranty with MTU, so any services and repairs had to be done by an accredited service center or else the warranty could be voided.  (JX82 at 171) (Captain Dep.); (JX83 at 62) (Engineer Dep.).  [Agreed]

124.    According to Engineer Waugh, the fact that the vessel was new and under warranty meant that he could not pull anything apart and repair it himself, and he had to get professionals to do any servicing or repairs.  (JX83 at 62) (Engineer Dep.).  [Agreed]

125.    Engineer Waugh would discuss work that needed to be done with Captain Nicholls.  (*Id.* at 63).

126.    It was not Captain Nicholls's general practice to meet with every third-party servicer who came on board the Yacht, but he was generally aware of third parties who may be attending the vessel, even if he did not work with them directly, because third parties cannot board the vessel without his permission.  (JX82 at 173) (Captain Dep.).  [Agreed]

### 1.    The April 24th Service Repair Order

127.    On April 24, 2018, FDDA was called to the Yacht for service because the port engine was losing prime.  (JX93); (JX83 at 65, 132) (Engineer Dep.).  [Agreed]

128.    The fuel-priming system would go dry if left longer than ten (10) days. (JX82 at 66) (Captain Dep.).  [Agreed]

129.    An unknown FDDA service technician was dispatched to the Yacht while it was docked at RMK Merrill-Stevens shipyard in Miami, Florida.  (JX93).  [Agreed]

130.    The FDDA service technician met with Captain Nicholls and Engineer Waugh, and there was no representative of the owner present.  (JX83 at 67) (Engineer Dep.).  [Agreed]

131.    Engineer Waugh testified that he did not know if he "ever told anyone at FDDA that someone from the Owner needed to be present in order for [FDDA technicians] to look at the engine." (*Id.*).  [Agreed]

132.    Engineer Waugh testified that he did not "tell the technician at FDDA that someone from the owner's office would be required to sign any service repair order or contracts." (*Id.* at 68:24–69:2).  [Agreed]

133.    The technician did not find the issue, and no tools were ever used on the Yacht for this job.  (*Id.* at 69–70).

134.    A work order, or Service Repair Order ("SRO"), for the service call on April 24th was signed by Engineer Waugh ("April 24th SRO").  (JX93).  [Agreed]

135.    The April 24th SRO includes a separate box highlighting the Additional Terms of Sale.  ((*Id.*).  It asks the authorized representative to initial and contains the following notice: "Hereby Accepting the Additional Terms of Sale Included Herein." (*Id.*).  Engineer Waugh initialed the box.  (*Id.*).  The April 24th SRO also has copies of staple holes on the first and second.  (*Id.*).

136.    The April 24th SRO is not at issue in this dispute.  Still, it suggests a custom and practice of senior crew members reviewing and signing FDDA's SROs—including acknowledging the Terms of Sale.

## 2.    The May 11th Service Repair Order

137.    On May 10, 2018, FDDA was called again to the Yacht for service because the starboard engine was losing prime due to a failed fuel filter.  (JX94).  [Agreed]

138.    Tyler Jakubas ("Jakubas") was dispatched to the Yacht while it was docked at Fisher Island, Florida, and his work entailed replacing the secondary fuel-filter housing on the starboard engine.  (Dkt. No. 182 at 12); (JX83 at 72–74) (Engineer Dep.).  [Agreed]

139.    Jakubas is a marine-diesel technician.  (Dkt. No. 182 at 6).  He was hired by FDDA in 2017 and was one of several service technicians who worked in FDDA's service department in 2018.  (Dkt. No. 175 at 11–12); (Dkt. No. 182 at 9).  [Agreed]

140.    In 2018, FDDA's service department was managed by Kevin Donohue ("Donohue"), who later retired from FDDA after 40 years of service in various capacities, including service technician, service supervisor, and service manager.  (Dkt. No. 175 at 6–9, 11–12).  Donohue testified at trial as FDDA's corporate representative.  [Agreed]

16

141.    The SRO was signed by Engineer Waugh for the work on May 11, 2018 ("May 11th SRO").  (JX94); (Dkt. No. 182 at 19).  [Agreed]

142.    Jakubas testified at trial that FDDA's SROs consist of a "front page work order and two other pages.  They're stapled together and they're put into a plastic sleeve." (Dkt. No. 182 at 18).  [Agreed]

143.    The May 11th SRO, as presented at trial, reflects three pages—a first-page work order and two pages of terms and conditions.  (JX94).  [Agreed]

144.    Although the two pages of terms and conditions following the front page of the May 11th SRO—FDDA's "Additional Terms of Sale"—were not initialed or signed, there was no requirement for a signature or initials on those pages.  The front page of the SRO specifically calls attention to the Additional Terms of Sale with a separate box requesting the authorized representative to initial and contains the following notice: "Hereby Accepting the Additional Terms of Sale Included Herein."  The box was initialed by Engineer Waugh.  (*Id.*).



145.    Skolnick agrees he did not ever give any instruction to Captain Nicholls or Engineer Waugh that they were required to initial every page of any document that they signed while serving on the vessel.  (Dkt. No. 174 at 134:20–135:10).  [Agreed]

146.    Skolnick testified that he did not believe he had to give specific instructions to Captain Nicholls or Engineer Waugh on how to sign documents.  (*Id.*).  [Agreed]

147.    The copy of the May 11th SRO shows staple holes on the first and second pages.  (JX94).

148.    Engineer Waugh agreed with the FDDA recommendation to change the fuel filter, as the Yacht had not moved under its own power since he had joined the vessel in March 2018.  (JX83 at 74–75) (Engineer Dep.).  [Agreed]

149.    Neither the work nor the Additional Terms of Sale of the May 11th SRO are at issue in this dispute.  Still, it suggests a custom and practice of senior crew members reviewing and signing FDDA's Service Repair Orders, including acknowledging the Additional Terms of Sale.

150.    As part of his daily work routine and job requirements, Jakubas filled out daily "Acknowledgment" reports, which detailed the work performed and steps taken. (JX21).  For example, on May 11, Jakubas traveled to the Yacht at Fisher Island, inspected and primed the fuel system, identified that the secondary fuel filter had a vacuum leak causing the engine to lose prime, and he sourced new parts.  (*Id.*) (S&S000027–28).  On May 18, Jakubas traveled back to the Yacht at Fisher Island, installed a new fuel filter, primed the fuel system, cleaned up and wrote out all paperwork and time.  (*Id.*) (S&S000029).  [Agreed]

### 3.    The May 24, 2018, Sea Trial

151.    On May 24, 2018, the Yacht was taken for a sea trial by Captain Nicholls and Engineer Waugh.  [Agreed]

152.    The May 24, 2018, sea trial was the first time that Captain Nicholls and Engineer Waugh attempted to take the Yacht out under her own power.  (JX82 at 151:9–13) (Captain Dep.).  [Agreed]

153.    Various pre-departure checks and procedures were run before the sea trial. (*Id.* at 243–45).  [Agreed]

154.    According to Captain Nicholls, the crew ran the engines up for half an hour, and there was no sign of a rise in temperature or pressure.  All readings on the computers were fine.  (*Id.* at 243–44).  [Agreed]

155.    According to Engineer Waugh, pre-departure checks were done in the engine room and took anywhere from 5–10 minutes.  (JX83 at 82) (Engineer Dep.). Engineer Waugh made a pre-departure check list prior to this time, so he knew what the run-through was like.  (*Id.*).  The list included checking all the fluids in the engines such as oil, coolant, etc.; starting the engines; running them up to temperature; and making sure everything is running correctly.  (*Id.* at 81–82).  [Agreed]

156.    As part of the pre-departure routine, Engineer Waugh "revved the engines up to [1000] RPMs with no load on them and just checking to make sure that there was seawater flow through the cooling system on both engines."  (*Id.* at 88:1–6).  [Agreed]

157.    Shortly after leaving the dock and entering open water, both main engines overheated and shut down.  (Dkt. No. 174 at 8–9); (JX18) (Captain Incident Report); (JX17) (Engineer Incident Report).  [Agreed]

158.    Captain Nicholls testified that there were no faults on the boat to indicate any restrictions when conducting the sea trial.  (JX82 at 230) (Captain Dep.).  He further testified that inflow of water would have been evident during the pre-departure checks if there was a restriction, but this was not the case at all.  (*Id.* at 253).  [Agreed]

159.    Within minutes of the vessel coming off the dock, both main engines alarmed and shut down.  (*Id.*  at 252–53).  Captain Nicholls did not think that the issue was a problem with seawater inflow; however, the Yacht had experienced other issues including the priming pump and the lift pump from the fuel tank (as there was no day tank on board).  (*Id.* at 255–57).  [Agreed]

160.    Bennetti was "basically trying to say that lack of maintenance" on the Yacht was the cause of the issues during the May 24, 2018, sea trial.  (*Id.* at 256).  [Agreed]

161.    Captain Nicholls prepared a report on the incident because it needed to be reported to management and the owner's representatives.  (*Id.* at 155–56); (JX18) (Captain Incident Report).  Captain Nicholls's report was sent to Burgess, Fischer, Benetti, and others.  [Agreed]

162.    Engineer Waugh also made a report.  (JX83 at 164–65) (Engineer Dep.); (JX17) (Engineer Incident Report).  [Agreed]

### 4.    The May 29th Service Repair Order

163.    Following the failed May 24, 2018, sea trial, FDDA was called to investigate the loss of main power to the engines.  (Dkt. No. 174 at 9); (JX82 at 163) (Captain Dep.).  [Agreed]

164.    Engineer Waugh made the call to FDDA.  (Dkt. No. 182 at 27).  [Agreed]

165.    According to Captain Nicholls, it was not uncommon for department heads, such as Engineer Waugh, to have relationships with service providers.  (JX82 at 178) (Captain Dep.).  [Agreed]

166.    According to Captain Nicholls, it was not uncommon for crew members to call in service operators to get an initial idea of the work needed, but as far as any expensive items, nothing got done without prior approval of management or the owner once the job got above a certain amount.  (*Id.* at 180).  [Agreed]

167.    Skolnick did not expect Captain Nicholls or Engineer Waugh to obtain approval from Skolnick to contact third-party service companies to service the Yacht.  (Dkt. No. 174 at 130).  [Agreed]

168.    Skolnick did expect Captain Nicholls to have a conversation with Aaron Fischer about such work and to obtain approval before charging any amounts over $500. (*Id.* at 78, 130), (JX82 at 182–83) (Captain Dep.).  [Agreed]

169.    Engineer Waugh called Jakubas personally to inquire as to what could cause both engines to overheat.  Jakubas testified that he was informed that the A/C plant and Rolls-Royce Azipull drives also overheated.  (Dkt. No. 182 at 27–29).  [Agreed]

170.    According to Captain Nicholls and Engineer Waugh, part of the reason for removing the heat-exchanger plates was to understand whether the cooling system on the engine was the cause of the engine overheating.  (JX82 at 232) (Captain Dep.); (JX96) ("Removal of plate coolers for inspection and clean[ing] was carried out by [FDDA].  This was done to prove whether or not the cooling system on the engine was the cause of the engine overheating.").  [Agreed]

171.    Captain Nicholls also believed the lift pumps for fuel into the main engines were part of the cause.  (JX82 at 254–55) (Captain Dep.).  Engineer Waugh also testified that he had done an investigation following the failed May 24, 2018, sea trial and determined the raw-water pumps were dry.  (JX83 at 99) (Engineer Dep.).  Engineer Waugh also testified that FDDA had gone through a punch list and indicated that the plate coolers could be the cause of the overheating.  (*Id.* at 100).  [Agreed]

172.    None of Jakubas's contemporaneous work records—including his daily Acknowledgment reports from May 29, 2018, to June 1, 2018—mention anything about his belief that the overheating issue was related to the strainers in the intake system.  (*See* JX21) (S&S000100–06); (JX134); (JX135).  There is also no evidence that Jakubas or anyone from FDDA recommended or suggested that the strainers in the intake system be investigated or cleaned.  Jakubas's daily Acknowledgment reports from the time all discuss cleaning the heat-exchanger plates and nothing else.  (JX21) (S&S000100–06); (JX134); (JX135).

173.    On May 29, 2018, Jakubas and an apprentice were dispatched to the Yacht for "heat exchanger service to port and [starboard] engines."  (JX91); (Dkt. No. 182 at 32).  The boat was docked at the time at a boathouse marina on 17th Street in Fort Lauderdale, Florida.  (JX91); (Dkt. No. 182 at 32).  [Agreed]

174.    The apprentice attended to help carry tools/plates, as the components are heavy.  (Dkt. No. 182 at 32–34).  [Agreed]

175.    The heat-exchanger plates are part of the cooling system, which utilizes seawater to cool the engines and prevent overheating.  (Dkt. No. 174 at 9–11); (JX36) (picture with elbow hose).  The heat-exchanger plates function like the radiator in a car or truck.  (Dkt. No. 174 at 11).  [Agreed]

176.    To perform the heat-exchanger service, Jakubas removed the heat-exchanger plates, cleaned the plates in FDDA's shop, then reinstalled the plates. This process took about three days from May 29, 2018, to June 1, 2018. (Dkt. No. 138 at 11) (Admission of Fact #21); (JX21) (Jakubas Acknowledgments). [Agreed]

177.    Jakubas had previously cleaned heat-exchanger plates "over a thousand times" and had no prior issues with any of the previous heat-exchanger jobs in his career. (Dkt. No. 182 at 36–37). [Agreed]

178.    "Removal of plate coolers for inspection and clean[ing] was carried out by [FDDA]. This was done to prove whether or not the cooling system on the engine was the cause of the engine overheating." (JX96) (Engineer Boat House Report). [Agreed]

179.    To access and remove the heat-exchanger plates, Jakubas had to remove the black rubber elbow hose and metal O-ring clamps seen in the picture below. (Dkt. No. 138 at 11) (Admission of Fact #21); (JX21) (Jakubas Acknowledgments); (JX96) (Engineer Report); (Dkt. No. 176 at 97); (Dkt. No. 174 at 9, 12); (JX36-11); (DX154). [Agreed]

 

180.    On May 29, 2018, Jakubas drained the starboard engine of coolant and removed the heat-exchanger stack, cleaned bilges, and headed back to the shop. (Dkt. No. 182 at 37); (JX21-5). [Agreed]

181.    Jakubas testified that when he arrived at the Yacht for the job on May 29, the overall conditions of the engine room and the machinery space were "[n]eglected and lacking of maintenance." (Dkt. No. 182 at 17). [Agreed]

182.    Jakubas observed both Captain Nicholls and Engineer Waugh and found them to be "jovial, unprofessional, and lacked the professionalism that I'm used to seeing on vessels." (*Id.* at 26). [Agreed]

183.    Skolnick was also present on the Yacht on May 29, and he observed the two FDDA technicians remove the heat-exchanger plates on the starboard engine. (Dkt. No. 174 at 10–11, 73–74, 127). [Agreed]

184.    Skolnick did not identify himself as an owner of the vessel and did not introduce himself to the FDDA technicians. (*Id.* at 73:11–17). [Agreed]

185.    Skolnick was only present for a few minutes and did not remember any specific details. (*Id.* at 73–75). [Agreed]

186.    Skolnick did not raise any complaints about the nature or substance of the work that the FDDA technicians were performing and did not ever complain to the FDDA technicians that the Captain and Engineer were not authorized to have FDDA perform work on the Yacht. Skolnick "didn't say a word." (*Id.* at 74:5-13). [Agreed]

187.    Skolnick testified in rebuttal to Jakubas that the condition of the engine room on May 29 was very clean and that Jakubas's description otherwise was inaccurate. (Dkt. No. 176 at 5–6). [Agreed]

188.    Skolnick took no photos or videos of the engine room's condition on May 29, 2018. (*Id.* at 13–14). He also did not preserve footage from engine-room cameras or instruct anyone else to document the scene. (*Id.*). Jakubas and the apprentice likewise took no photos or videos that day, and FDDA introduced none at trial.

189.    Skolnick also testified that neither of the two FDDA technicians introduced themselves to Skolnick or presented any papers to him. (Dkt. No. 174 at 127). [Agreed]

190.    On May 31, 2018, Jakubas returned to the Yacht, drained the port engine, removed the heat-exchanger stack, loaded the van, and went to the shop to clean the heat-exchanger plates. (Dkt. No. 182 at 37); (JX21-5). [Agreed]

191.    There was common agreement that when the heat-exchanger plates were removed, they were found to be in good operating condition and that they were not the cause of the engine overheating. (JX96) ("All consensus by MTU technicians, Captain Anthony Nicholls and Chief Engineer Anthony Waugh, were in agreement that the plates were in good operating parameters and were not the cause of the engine over heating shutdowns."); (JX82 at 234) (Captain Dep.); (JX83 at 107) (Engineer Dep.); (Dkt. No. 174 at 12–13). [Agreed]

192.    At some point after arriving at the marina, Jakubas asked Captain Nicholls if he worked "for the vessel – or on the vessel," and then asked Captain Nicholls to sign an SRO, dated May 29, 2018, for the heat-exchanger service work ("May 29th SRO"). (JX91); (Dkt. No. 138 at 10) (Admission of Fact #19). [Agreed]

193.    Jakubas knew that Captain Nicholls was the Yacht's captain because they had previously met onboard at Fisher Island, where Jakubas had investigated the May 11, 2018, fuel-filter issue.  Captain Nicholls testified, "[N]o one gets onto Fisher Island without authorization.  And I had to arrange for technicians to come onto the ferry to get them onto the island.  It's very exclusive."  (JX82 at 186:5-8) (Captain Dep.).  Captain Nicholls arranged Jakubas's access to the island and then met with him on the Yacht.  (*Id*.).

194.    The May 29th SRO is the work order at issue in the case.  (JX91); (Dkt. No. 175 at 65).  [Agreed]

195.    Neither Captain nor Engineer ever indicated a lack of authority to engage FDDA during any of the days that Jakubas was on board.  (Dkt. No. 182 at 23:4–25).  Captain Nicholls never objected to FDDA when signing the SRO and never protested about the request to sign the SRO.  (JX82 at 293–94) (Captain Dep.).  [Agreed]

196.    Engineer Waugh confirmed that the FDDA service and parts were necessary, and he believed that work was being done with the approval of and for the benefit of the Yacht and her Owners.  (JX83 at 132–330) (Engineer Dep.).  [Agreed]

197.    Neither Captain nor Engineer informed Jakubas that there was approval required from a third party (Skolnick, Fischer, or Burgess) for FDDA to perform the work.  (Dkt. No. 182 at 24).  [Agreed]

198.    The May 29th SRO was signed by Captain Nicholls on May 31st—two days after Jakubas started the heat-exchanger service work.  (JX91).  [Agreed]

199.    Jakubas testified at trial that either a captain or an engineer signs SROs on jobs that he attends, and it is not always the captain 100% of the time.  (Dkt. No. 182 at 73).  This fact is evident given that Engineer Waugh signed the April 24th SRO and the May 11th SRO.  [Agreed]

200.    The Yacht was "big" as it was over 80 feet, and all such vessels have a captain.  Jakubas has brought SROs to jobs "thousands of times," and they are always signed by the captain (or other senior crew member), never signed by the Owner of the vessel.  (*Id.* at 24–25).  [Agreed]

201.    Captain Nicholls testified that by signing the May 29th SRO, he understood that he was allowing FDDA to service the heat exchangers.  (JX82 at 287) (Captain Dep.).  Captain Nicholls testified that his practice for reviewing purchase orders is to make sure the work being done is what was ordered and not something that was different or unplanned.  (*Id.* at 187–89).  [Agreed]

### 5. Whether the May 29th Service Repair Order Included FDDA's Additional Terms of Sale

202.    Plaintiff disputes whether the May 29th SRO that was presented to Captain Nicholls included the second and third pages of terms and conditions as reflected in Joint Exhibit 91.  [Agreed]

203.    Donohue does not know if Jakubas had the terms and conditions with him when he boarded the Yacht on May 29.  (Dkt. No. 175 at 65).  However, Donohue testified that it was "standard practice for these particular terms and conditions to be delivered to the customer at the time the SRO was presented to the customer for review."  (*Id.* at 99). [Agreed]

204.    Jakubas testified that he was given the SRO stapled to the Terms of Sale in a clear plastic sleeve.  (Dkt. No. 182 at 21).  [Agreed]

205.    Jakubas testified that he gave the papers to Captain Nicholls, who took the SRO out of the sleeve, reviewed, signed, and took pictures of it.  (*Id.* at 21–22).

206.    The two pages of terms and conditions following the front page of the May 29th SRO are not initialed or signed.  (JX91); (Dkt. No. 174 at 124).  [Agreed]

207.    There was no location or space where a signature or initial was required to be affixed on the two pages of terms and conditions on the May 29th SRO.  (JX91); (Dkt. No. 174 at 136:1–7).  [Agreed]

208.    The May 29th SRO also includes a separate box which calls attention to the Terms of Sale requesting the authorized representative to initial and contains the following Notice: "Hereby Accepting the Additional Terms of Sale Included Herein." The box was initialed/signed by Captain Nicholls.  (JX91).  [Agreed]



209.    Captain Nicholls signed/initialed the May 29th SRO at least three times, in the middle of the page, next to the notice section to accept Terms of Sale, and as a customer or authorized representative.  (*Id.*); (Dkt. No. 175 at 99).  [Agreed]

210.    The first page of the May 29th SRO has a physical staple mark, and the second page shows some markings of where a staple was located.  (JX91).

211.    Captain Nicholls's initials next to a notice saying, "Hereby Accepting the Additional Terms of Sale Included Herein," is at least some evidence that the terms of sale were included with the contract.  (*Id.*).

212.    The May 29th SRO also does not include any indications or markings that it is a "Customer Copy," nor was there any evidence presented at trial that SROs are ordinarily left with the customer or at the vessel.  (*Id.*); (Dkt. No. 175 at 64).  [Agreed]

213.    Jakubas testified that Captain Nicholls took pictures of all three pages of the May 29th SRO.  (Dkt. No. 182 at 22).  [Agreed]

214.    The May 29th SRO also contains a footer with the inscription of various numbers and letters, including "DIAZA," which Plaintiff contends is an identifier for Anthony (Tony) Diaz.  (Dkt. No. 175 at 68–69).  But there was no actual evidence on this point.  (*Id.* at 69:2-3) ("[T]hat stands for Tony Diaz; is that right?  Oh I don't know.").

215.    Tony Diaz ("Diaz") was a service writer and long-time employee for FDDA who worked for Kevin Donohue.  (*Id.* at 52).  Diaz did not testify at trial.  (*Id.*).  [Agreed]

216.    The numbers and letters printed on the first page footer are not repeated on the footer of the second and third pages of the May 29th SRO, which, according to Donohoue, means those pages were possibly added later.  (JX91 at 2–3); (Dkt. No. 175 at 69–70).  [Agreed]

217.    On May 30, 2018, Captain Nicholls also signed a Letter of Authorization to Charge Bankcard for an initial deposit of $7,200 toward the heat-exchanger-cleaning job, which Captain Nicholls then emailed to FDDA on May 31, 2018.  (JX19); (JX104) (S&S000108–09) (duplicate); (JX130) (duplicate).  [Agreed]

218.    Captain Nicholls testified that the letter of authorization to charge bankcard is a very common document and that credit-card information is not given out without an authorization form.  (JX82 at 197–200) (Captain Dep.).  [Agreed]

219.    Captain Nicholls testified that, prior to the work being done, Fischer and Burgess would have been notified about the work and the cost because it was way above the limits of his authorization for spending.  (*Id.* at 191–92, 197–200).  [Agreed]

220.    Captain Nicholls testified that authorization for work would have come from Fischer or Burgess and that he does not "have authorization unless [he is] directed to do it from management."  (*Id.* at 193).  [Agreed]

221.    Captain Nicholls was adamant that authorization for FDDA work would have come from Fischer or Burgess because it was "outside [his] pay grade."  (*Id.*).  [Agreed]

222.    In short, he would have received approval for the work and the amount before using the credit card to pay the $7,200 deposit. (*Id.* at 198).  [Agreed]

223.    The $7,200 deposit was paid by credit card on May 31, 2018. (JX132).  [Agreed]

224.    The Court finds the evidence sufficient to show that Captain Nicholls, the senior-most crew member on board and in charge of the Yacht and the agent of the Plaintiff, received and signed the May 29th, 2018, SRO, including the acknowledgment and agreement to the FDDA Terms of Sale.

225.    The Court further finds the evidence sufficient to show that the May 29th SRO and Terms of Sale were presented to Captain Nicholls as an integrated document.

### 6.    Whether Jakubas "Reinstalled" the Black Rubber Elbow Hose

226.    The Parties dispute whether Jakubas reinstalled the black rubber elbow hose when reinstalling the heat-exchanger plates.  [Agreed]

227.    According to FDDA's corporate representative, Kevin Donohue, FDDA's ordinary procedure after cleaning a heat-exchanger plate is to "reinstall" it on board the yacht, which is the process of reconnecting it to the boat, filling the cooling system with fluids, and starting up the engine to run.  (Dkt. No. 175 at 22–24).  [Agreed]

228.    Engineer Waugh testified that FDDA reinstalled the plates and made sure they "all sealed up with seals and no water leaks."  (JX83 at 107:10–15) (Engineer Dep.); (JX96) (Engineer Boat House Report). [Agreed]

229.    Jakubas testified at trial that when he returned to the vessel to reinstall the heat-exchanger plates on May 31 (for the starboard side) and June 1 (for the port side), he observed other technicians working in the engine room on various components.  (Dkt. No. 182 at 40).  [Agreed]

230.    Jakubas testified that he reinstalled the heat-exchanger plates as per usual course, but that he was unable to reinstall the black rubber elbow hoses or start the engines due to other work being performed.  (*Id.* at 42). [Agreed]

231.    Jakubas testified that he saw two (2) techs from Rolls-Royce and an A/C tech working on board on June 1, 2018.  (*Id.* at 40).  The Rolls-Royce techs were working on the heat exchangers for the Azipulls, and the A/C tech was working on the cooling plant and some ducting.  (*Id*. at 40–41).  [Agreed]

232.    Jakubas testified that the white discharge pipes to which the black rubber elbow hoses connect were "swung out of the way and the engine cage [had been] disassembled."  (*Id*. at 42, 97–101).  Jakubas also testified that he was prevented from

26

reconnecting the black rubber elbow hoses and was instructed by the Chief Engineer to "just put it into place" without installing the accompanying O-ring clamps. (*Id.* at 50–52). [Agreed]

233.    Jakubas testified that the engine was not operational, and the Yacht was unable to perform a sea trial at that time. (*Id.* at 42). Accordingly, Jakubas testified that he told the Captain and Engineer at least six or seven times that he would want to be present for the startup and sea trial. (*Id.* at 42–43). [Agreed]

234.    Jakubas further testified that the chrome piping in front of the heat-exchanger plates had been sawed in half by Engineer Waugh. (*Id.* at 45–46). [Agreed]

235.    Specifically, Joint Exhibit 36-11 is a picture of the starboard engine and shows the secondary fuel-filter housing and the heat-exchanger stack. (*Id.* at 43–44.). Jakubas testified that he saw Engineer Waugh remove the horizontal brace with a saw and use blue tape to cover the jagged edges. (*Id.* at 45–46). According to Jakubas, the event occurred at the time of removal because there was a coolant pump/bucket in the photo with a hose in it, and zip ties had been threaded through the heat-exchanger plates to keep them together as part of the removal. (*Id.* at 46–48); (DX153). [Agreed]

236.    Jakubas also identified in Joint Exhibit 36-11 that there was "some sort of gauge," which was not normal equipment he would see on an MTU engine, but was added by Engineer Waugh to "aid in priming the raw water system and to test pressures." (Dkt. No. 182 at 49:5–16, 27–28). [Agreed]

237.    Jakubas explained that the discharge pipe was rotated and pushed out of the way to facilitate work with railing and Azipulls, which prevented him from being able to reconnect the flexible black discharge pipe. (*Id.* at 50). [Agreed]

238.    Jakubas did not place a wrench, tool, or anything on the black fitting because he "was instructed not to" by the engineer, and he never saw the horizontal chrome cross beam put back in place by the time he left the Yacht. (*Id.* at 54–55). [Agreed]

239.    Jakubas had worked on board the sister yacht a couple of dozen times. (*Id.* at 10–11). In reviewing the photo at Joint Exhibit 37-21, Jakubas testified that there was irregular ducting from the A/C, which was not normal, not on the sister yacht, and not part of the design of the vessel. (*Id.* at 53–54). [Agreed]

240.    Jakubas also testified that Joint Exhibit 37-21 shows a fan which was not a normal setup in the engine room. Jakubas testified that he was told by Engineer Waugh that the shore power converter was not receiving enough air movement in the area of the engine room, so the fan was placed to give more air supply to the shore power converter. (*Id.* at 54). [Agreed]

241.    Jakubas's trial testimony conflicts with the Parties' agreed admissions of fact in their Joint Pretrial Order.  (Dkt. No. 138).  There, the Parties stipulated that "Jakubas loosened the clamps and removed the fitting hose in order to access the heat exchanger plates.  After the heat exchanger plates were cleaned, he *reinstalled* the heat exchanger plates and the fitting hose."  (*Id.* at 11) (Admission of Fact #22) (emphasis added).

242.    Engineer Waugh testified that his "understanding was [that] the vessel was still under a Benetti warranty so everything was warrantized [*sic*].  That meant that I could not pull anything apart and repair it myself so I had to get professionals in to do any servicing or repair work."  (JX83 at 62) (Engineer Dep.).  [Agreed]

243.    According to Engineer Waugh, he was present when the heat-exchanger plates were reinstalled, and upon reinstallation, everything was sealed up and then tested under an idle engine start with new coolant in the cooling system.  (*Id.* at 107).  [Agreed]

244.    When Jakubas was deposed in October 2021, he testified that "after [he] installed or reinstalled the heat exchanger plate," he did "have to **reinstall** the fitting and the hose in front of the heat exchanger plate," which installs with "four clamps."  (Dkt. No. 182 at 57–58, 94–95) (emphasis added).  [Agreed]

245.    Jakubas's daily Acknowledgment reports from May 31 and June 1 do not mention that he did not finish the reinstallation or that he had been instructed not to reinstall the black rubber elbow hose at any time.  (JX21); (Dkt. No. 182 at 80).  [Agreed]

246.    Jakubas's daily Acknowledgment reports reflect the work and individual steps that Jakubas took on each day of the heat-exchanger-cleaning job.  (Dkt. No. 182 at 62–63).  [Agreed]

247.    Jakubas testified that his "daily reports reflect the work that was done.  I wouldn't be putting in my daily report about the work being done on the vessel by other people or the environment."  (*Id.* at 71:24–72:1).  [Agreed]

248.    On Tuesday, May 29, Jakubas traveled to the Yacht and loaded tools on board; drained the starboard main engine of coolant and removed the heat exchanger; cleaned bilges and loaded all parts; and traveled back to the shop.  (JX21) (S&S000100). [Agreed]

249.    On Thursday, May 31, Jakubas traveled to the Yacht; drained the port main engine of coolant; removed the heat exchanger from the vessel; cleaned bilges and front covers; traveled back to the shop; and cleaned both heat-exchanger stacks.  (JX21) (S&S000102).  Later that same day, Jakubas traveled to the Yacht; loaded and installed the starboard main engine heat exchanger; cleaned up; and traveled back to the ship.  (JX21) (S&S000104).  Jakubas's real-time daily notes do not say that he was unable to finish

reinstalling the heat-exchanger plates or the hose clamps on the starboard side because other work was allegedly being done. (JX21); (Dkt. No. 182 at 76). [Agreed]

250.     On Friday, June 1, Jakubas traveled to the Yacht; took oil samples from both main engines; installed the port main engine heat exchanger "and compressed to spec"; filled and pressure tested both engines at 15 psi for .5 hours per engine; noted no leaks and tested coolant concentration; cleaned up and loaded van; traveled back to shop; completed sample kits and all paperwork. (JX21) (S&S000105); (Dkt. No. 182 at 38). As with the starboard side, Jakubas's real-time daily notes do not say that he was unable to finish reinstalling the heat-exchanger plates or the hose clamps on the port side because other work was allegedly being done. (JX21); (Dkt. No. 182 at 76). [Agreed]

251.     Jakubas's daily notes do not show that he "compressed to spec" anything on the starboard side as was notated in the daily note for the port side. *Compare* (JX21) (S&S000104) (starboard notes) *with* (JX21) (S&S000105) (port-side notes). [Agreed]

252.     When asked by the Court how he "would pressure test [the system] if the clamp wasn't torqued down," Jakubas responded that "the clamp is on the saltwater side, and [he] pressure tested the engine coolant side. So the—they're two separate systems." (Dkt. No. 182 at 66). [Agreed]

253.     Jakubas also admitted at trial that his job was to put the pieces back together the way that he found them, that it was unusual not to do so, and that he would want to tell someone if he were not going to put the pieces back together. (*Id.* at 66–67). None of Jakubas's daily Acknowledgment reports from this time indicate that he told anyone about being instructed not to reinstall the black rubber elbow hose and clamps. (JX21); (JX134); (JX135).

254.     Moreover, at some point after June 1, Jakubas's supervisor asked him to write two letters that provided further details about his heat-exchanger-cleaning job. (Dkt. No. 182 at 67–72); (JX134); (JX135). The work details of these after-the-fact letters are not consistent with the work details from Jakubas's daily Acknowledgment reports, which were prepared in real time. *Compare* (JX21) *with* (JX134) *and* (JX135); (Dkt. No. 182 at 68–72, 77).

255.     Skolnick testified in rebuttal that the white discharge pipe to which the black rubber elbow hose connects is a metal, rigid pipe and cannot be tilted or swung out several degrees as suggested by Jakubas. (Dkt. No. 176 at 6–7). [Agreed]

256.     Skolnick further testified in rebuttal that the chrome piping around the engine could be unfastened like a curtain rod with built-in connection points and did not require a hacksaw to cut through the metal to access the heat-exchanger plates for routine maintenance, as suggested by Jakubas. (*Id.* at 9–12); (JX36-11). [Agreed]

257.    The Court finds that Jakubas's deposition testimony and his contemporaneous daily reports are more credible than his trial testimony and that Jakubas reinstalled the black rubber elbow hose.  (JX21); (Dkt. No. 182 at 97–101).

F.    BOTTOM CLEANING AT FORT LAUDERDALE MARINE CENTER

258.    Following the failed May 2018 sea trial, the vessel was hauled from the water in early July 2018, and barnacles and sea growth were observed on the bottom of the hull.  (Dkt. No. 174 at 15).  [Agreed]

259.    Specifically, Benetti sent a surveyor to the Yacht who concluded that Engineer Waugh "was not doing [his] job, and [he] was incompetent; that the standpipe underneath the sea strainer was choked with mussels and oysters." (JX83 at 112:22–113:1) (Engineer Dep.).  [Agreed]

260.    Engineer Waugh testified that he believed the "Venturi effect" caused the lack of water in the pumps or in the plate coolers.  (*Id.* at 110).  [Agreed]

261.    The Yacht's manufacturer, Benetti, basically laughed at the engineer's conclusion.  (*Id.* at 111).  [Agreed]

262.    On June 25, 2018, Benetti sent Specialist Marine to the Yacht to perform an inspection on behalf of Benetti.  (*Id.* at 113, 116); (DX147). [Agreed]

263.    Despite Engineer Waugh's testimony that he cleaned the strainers every week, (JX83 at 93) (Engineer Dep.), the surveyor found the "strainer basket . . . heavily corroded with marine growth and partially to completely clogged," (*id.* at 116); (DX147). [Agreed]



264.    The body of the valve was found heavily covered with marine growth, both soft and hard, making it impossible to completely close the valve.  (DX147).  [Agreed]



265.    Accordingly, the decision was made to remove the vessel from the water. (JX83 at 118) (Engineer Dep.).  [Agreed]

266.    Specialist Marine reattended and performed inspections over the course of July 3, 5, and 12, 2018, before issuing the survey report on July 16, 2018.  (*Id.* at 119); (DX148).  [Agreed]

267.    Engineer Waugh agreed that the photos in the survey report were a fair depiction of the condition of the hull of the Yacht and showed hard marine growth covering the raw water intake grills.  (JX83 at 121–22) (Engineer Dep.); (DX148).  [Agreed]



268.    Engineer Waugh explained about the amount of marine growth found, "well, it's the worst—worst I've ever seen a boat, for starters.  It was questioned whether or not the antifouling on the bottom of the boat was actually a reputable type . . . ."  (JX83 at 123:1–5) (Engineer Dep.).  [Agreed]

269.    Engineer Waugh acknowledged that he was aware that Benetti believed the excessive marine growth was the result of a lack of maintenance.  (*Id.* at 131).  [Agreed]

270.   Captain Nicholls testified that marine growth is not uncommon on boats that are kept upriver in the Miami River as the summer gets hot and growth builds up quickly.  (JX82 at 225, 227) (Captain Dep.).  [Agreed]

271.   The boat was taken to Fort Lauderdale Marine Center ("FLMC") for a "bottom cleaning" of the hull.  (Dkt. No. 174 at 16); (Dkt. No. 181 at 113); (Dkt. No. 175).  [Agreed]

272.   Skolnick testified that he had the bottom of the hull scraped down, repainted, and a new anti-fouling applied.  (Dkt. No. 174 at 16).  [Agreed]

273.   The bottom cleaning included sand blasting the bottom of the hull, propellers, and the grates, and applying new anti-fouling to the hull.  (JX83 at 125–27) (Engineer Dep.).  [Agreed]

274.   During this time, Engineer Waugh was still reporting to the vessel and making sure the work was being processed correctly by FLMC and everything was operational.  (*Id.* at 126).  [Agreed]

275.   Skolnick testified that he was not aware of any work done while the vessel was hauled at FLMC involving someone in the engine room removing the heat-exchanger plates or the black rubber elbow hose.  (Dkt. No. 174 at 17).  [Agreed]

276.   Fischer also testified that he did not receive or pay any invoices related to work done in the engine room after May 2018 that would have involved the removal of the heat-exchanger plates or the black rubber elbow hose.  (Dkt. No. 181 at 36–37).  [Agreed]

277.   Captain Nicholls testified that no other service companies had come onto the vessel to perform repairs based on the overheating engine issue between April 2018 and August 24, 2018.  (JX82 at 288–89) (Captain Dep.).

278.   The Court finds that no work was performed inside the engine room involving either the heat-exchanger plates or the black rubber elbow hose while the boat was hauled at the FLMC during the summer of 2018.

**G.   FDDA'S INVOICES AND ADDITIONAL TERMS OF SALE**

279.   On June 12, 2018, Diaz sent an email to Captain Nicholls attaching a "Trial Invoice" related to the May 29th SRO, stating, "Hello Anthony, The attached document represents your total invoice."  (JX128).  [Agreed]

280.   The Trial Invoice attached to Diaz's email is a "Customer Copy."  (*Id.*); (Dkt. No. 175 at 60–63).  It states at the bottom of the invoice that "Purchaser agrees to the additional terms of sale included herein."  (JX128); (Dkt. No. 175 at 67).  However, the

Trial Invoice attached to Diaz's email does not include any terms and conditions. (JX128).  [Agreed]

281.    The total amount charged on the invoice was $10,000.62.  (*Id.*).  That amount was charged to the credit card for Constance Joy II, LLC.  (JX132).  [Agreed]

282.    Diaz is the only person from FDDA who would have been in a position to provide FDDA's terms and conditions with an invoice.  (JX128); (Dkt. No. 175 at 60–62). [Agreed]

283.    Diaz's email confirms that FDDA sent an invoice related to the May 29th SRO to Captain Nicholls.  (JX128).

284.    On June 13, 2018, the next day, Captain Nicholls responded to Diaz and stated that he would forward the one-page Trial Invoice to the "home office with instructions for payment by wire."  (JX129); (Dkt. No. 175 at 62).  [Agreed]

285.    On August 21, 2018, Captain Nicholls sent an email to Fischer (with a copy to Colin Williams), attaching two Trial Invoices from FDDA for the for work related to the April 28th SRO and the May 10th SRO, and asking Fischer, "Do you give me authority to use the Visa for this payment?"  (Dkt. No. 181 at 6); (JX23 at 4–8); (JX20) (credit-card authorization).  [Agreed]

286.    Colin Williams was copied on the emails as the replacement captain because Captain Nicholls had resigned.  (Dkt. No. 181 at 9–10).

287.    The two Trial Invoices attached to Captain Nicholls's August 21st email were single-page invoices and did not include any additional terms and conditions.  (JX23 at 4–8).  [Agreed]

288.    On August 22, 2018, Captain Nicholls followed up with Fischer for approval to pay the Trial Invoices because FDDA was scheduled to attend the vessel on August 23, 2018.  (*Id.* at 3–4).  Fischer responded by email, stating that "this seems like a lot of money for a filter and installation."  (*Id.* at 3).  [Agreed]

289.    The Captain's August 21st and 22nd emails with Fischer regarding payment of invoices developed into a string communication between Fischer, Captain Nicholls, and representatives of FDDA (Tony Diaz) and Benetti (Giannerini) regarding whether FDDA's work to address the causes of the overheating issues in April and May of 2018 was covered under warranty.  (JX24) (Mr. Fischer: "I know there is a dispute as to whether or not the MTU warranty has expired. While I cannot imagine how this could be the case there exists an extended warranty from Benetti. Therefore the amount due under this invoice is either covered under the MTU warranty and nothing is due or it is covered under the Benetti warranty and should be paid by Benetti—but in no instance is it owed by Mr. Skolnick.").  [Agreed]

290.    The Court finds that the FDDA invoices were provided to Captain Nicholls, an authorized agent and senior-most officer commanding the Yacht, and that the invoice referred to and incorporated the FDDA's Additional Terms of Sale.

### H.    FDDA'S NOTICE OF THE AUGUST 24, 2018, SEA TRIAL

291.    On August 21, 2024, an unknown service technician from FDDA was on board the Yacht addressing several alarms coming from the engines, but he left without success.  (Dkt. No. 175 at 53–54); (JX22) (email from Benetti to FDDA's Tony Diaz). [Agreed]

292.    On August 22, 2024, Benetti notified Diaz from FDDA by email of this fact and advised FDDA that another technician was scheduled to attend the Yacht at 10 a.m. that morning but "unfortunately nobody showed up."  (Dkt. No. 175 at 53–54); (JX22) ("At this time[,] no technician showed up[,] and the yacht is stuck at the Boathouse. For today was scheduled the sea-trial, technician from Rolls-Royce arrived here yesterday to do that, but now we cannot perform that because of the MTU alarms. We need urgently skilled technician to fix this issue and perform the sea trial.").  Diaz responded to Benetti that FDDA was making arrangements to send a Senior Electronic technician on August 23, who will "troubleshoot the alarms and no start issue [with the engines] and assist Rolls-Royce with any MTU electronic inquires."  (Dkt. No. 175 at 53–56, 102); (JX22 at 1) (email from FDDA's Tony Diaz).  [Agreed]

293.    If an FDDA technician had attended on August 22 as scheduled, then that technician could have gone on the sea trial that day.  (Dkt. No. 175 at 55).  [Agreed]

294.    On August 23, 2018, Captain Nicholls advised the parties to the email, including Diaz, that a sea trial was planned for Friday, August 24, 2018.  (JX24 at 1); (JX82 at 289) (Captain Dep.).  Specifically, Captain Nicholls wrote, "We have ran [*sic*] both main engines and will continue tests through the afternoon. If . . . all goes well we will schedule sea trials for early tomorrow morning (Friday 24th)."  (JX24 at 1).  Captain Nicholls's email also confirmed that an FDDA technician (Allan English) was on board that same day (August 23) running "both main engines," "test[ing] through the afternoon," and "working through the active alarms."  (*Id.*); (Dkt. No. 175 at 77).  [Agreed]

295.    Captain Nicholls's statements are consistent with an Acknowledgment report from Allan English ("English"), a senior technician for FDDA, who reported that he was on board the Yacht on August 23, and the Yacht "is *scheduled* for a sea trial next day at high tide. The captain will call to setup time."  (JX101) (emphasis added).

296.    English's acknowledgment report also stated that, on August 23, English had run the engines for 1.5 hours after priming the fuel and seawater system because the vessel had issues keeping "fuel prime on the starboard engine and seawater prime on both engines if it sat overnight."  (*Id.*).  [Agreed]

297.    According to Donohue, in order to prime the seawater, there is a "potential for [FDDA technicians] to disconnect the [black rubber] elbow [hose] in order for them to put the prime in the[] [system]."  (Dkt. No. 175 at 91).  [Agreed]

298.    Donohue does not dispute that FDDA was notified through English's Acknowledgment report that a sea trial was scheduled for August 24, 2018, at high tide and that FDDA knew when high tide would occur.  (*Id.* at 46–48); (JX101) (English's Acknowledgment report).

299.    Donohue also testified that the job of a service technician like English and Jakubas is to fill out daily Acknowledgment reports accurately.  (Dkt. No. 175 at 44).  [Agreed]

300.    Donohue agrees that English was in the engine room on August 23, 2018 (the day before the sea trial) when he primed and ran the engines for 1.5 hours.  (*Id.* at 49).  Donohue agrees that English did not report any weeping or leaking in his daily Acknowledgment report of the same day.  (JX101); (Dkt. No. 175 at 50).  Donohue agrees that if there was weeping occurring at that time, English would have reported it.  (Dkt. No. 175 at 50).  Donohue agrees that, if the hose clamps to the black rubber elbow hose were loose, it would have been hard to miss some leakage or weeping once the engines were started and running at idle at the dock.  (*Id.* at 27).  Donohue also agrees that any conjecture by FDDA that there was unidentified weeping is disproven by English's presence in the engine room and running the engines the day before the seal trial.  (*Id.* at 50).  [Agreed]

301.    The Court finds that no work was performed on the heat-exchanger plates or the black rubber elbow hose for either the port side or starboard side engines after English left the Yacht.

302.    Jakubas testified that, if an FDDA technician was on board after June 1 and before the August 24, 2018, sea trial to run the engines, then that was good enough to satisfy Jakubas's concern about starting the engine to test his work, even though he was not present.  (Dkt. No. 182 at 82).  [Agreed]

303.    The Court finds there was no evidence presented at trial that there was any indication of a leak or weep before Captain Nicholls and Engineer Waugh pulled out for the August 24th sea trial.  [Agreed]

304.    The Court further finds that FDDA had notice that Captain Nicholls was preparing for a sea trial on August 24, 2018.

I.    THE AUGUST 24, 2018, SEA TRIAL ("SEA-SPRAY INCIDENT")

305.    On August 24, 2018, Captain Nicholls and Engineer Waugh conducted a sea trial of the Yacht.  [Agreed]

306.    Engineer Waugh testified that it was a perfect day to go out to sea because there was zero wind, low sea state, and a nice tide range.  (JX83 at 147–48) (Engineer Dep.).  [Agreed]

307.    The individuals on board during the sea trial included Captain Nicholls, Engineer Waugh, the first mate, a deck hand, and representatives from Rolls-Royce.  (*Id.* at 146, 153–54); (Dkt. No. 138 at 11) (Admission of Fact #24).  [Agreed]

308.    The crew performed the same type of pre-departure procedure as with the May 24, 2018, sea trial, including engine-running checks to confirm water was running through the system and turning maneuvers were working.  (JX82 at 264) (Captain Dep.); (JX24 at 2).  The process took about 20–30 minutes.  (JX83 at 147, 152–54, 157, 160) (Engineer Dep.).  FDDA has no evidence to suggest that pre-departure checks were not performed.  (Dkt. No. 175 at 78–79).  [Agreed]

309.    No one mentioned any water in the engine room during the initial tests and engine runs.  If that were the case, Captain Nicholls would have stopped to investigate. (JX83 at 267) (Captain Dep.).  [Agreed]

310.    It was not Skolnick's expectation that Captain Nicholls and Engineer Waugh would be responsible for walking around the engine room and inspecting every hose and facet to make sure everything is tightened down prior to departure on a sea trial.  (Dkt. No. 174 at 128).  [Agreed]

311.    During the sea trial, there were people, including Engineer Waugh, going up and down to the engine room at different periods of the sea trial.  Engineer Waugh testified that he was either in the engine room or communicating with the bridge via radio, but that he had to step outside the engine room to communicate via radio.  He also would sometimes go up to the bridge and communicate with Captain Nicholls directly. (JX83 at 147, 152–54, 157, 160) (Engineer Dep.).  [Agreed]

312.    No one was directed or assigned to remain in the engine room for the entirety of the sea trial.  (*Id.* at 155).  [Agreed]

313.    Defendant's marine engineer expert, Pierce Power, testified that during a sea trial, it is a customary and prudent practice that engineers would be in the engine room monitoring the equipment that is running at that time for the entirety of the sea trial.  (Dkt. No. 176 at 34–36).  [Agreed]

314.    The engine room is considered "unmanned" because it has a fully integrated self-monitoring system.  (JX82 at 266) (Captain Dep.); (JX83 at 84–85) (Engineer Dep.).  Alarm panels and main operating panels are duplicated on the bridge and are made for monitoring the engine system off-site from the bridge.  (JX82 at 266) (Captain Dep.); (JX83 at 84–85) (Engineer Dep.).  However, because the crew was conducting a sea trial, the crew also went down to the engine room to walk around and inspect the

conditions and reported back to the bridge to take readings of the screen.  (JX82 at 266) (Captain Dep.).  [Agreed]

315.    According to Captain Nicholls, the sea trial was proceeding normally for around 90 minutes.  The engines were then run up to a speed of 1,746 RPMs.  A short time later the Yacht went "dead ship."  (Dkt. No. 138 at 11) (Admission of Fact #25).  Engineer Waugh further described the events of the sea trial in a report, which Captain Nicholls testified was a "good report."  (JX82 at 268) (Captain Dep.); (JX25).  [Agreed]

316.    Upon "dead ship," all electric power was lost, and the boat was brought to an instant idle.  (JX83 at 156–62) (Engineer Dep.); (JX25 ¶ 12).  The crew then entered the engine room and found that sea "water [had gone] everywhere when that pipe let go."  (JX82 at 262) (Captain Dep.); (JX83 at 163) (Engineer Dep.); (Dkt. No. 138 at 12) (Admission of Fact #27).  The main electrical panel, Atlas converter, generator 1 and generator 2 were all sprayed with water.  (JX25).  According to Donohue, the water pressure coming out of the black rubber elbow hose at 1800 RPMs would have been 200 gallons per minute, "like a small firehose."  (Dkt. No. 175 at 26).  [Agreed]

317.    Engineer Waugh investigated the cause and determined the black rubber elbow hose had "popped off" the upper white pipe on the starboard main engine due to loose hose clamps.  (JX83 at 163–66, 169–70) (Engineer Dep.); (JX25) ("Rubber 90 degree fitting from the Starboard Main engine plate cooler to the exhaust overboard had dislodged."); (Dkt. No. 138 at 11) (Admission of Fact #26).  [Agreed]

318.    A decision was made to reinstall the black rubber elbow hose on the starboard main engine and bring the system back online.  (JX25); (Dkt. No. 138 at 12) (Admission of Fact #28).  "It was here that it was found that the hose clamps had not been tightened around the discharge pipework and the bonze pipework [on] the plate cooler."  (JX25 ¶ 22).  "Approximately 7 complete turns were made on all hose clamps [on] the rubber elbow [on] the Starboard Main Engine."  (*Id.*); (JX83 at 163–66, 169–70) (Engineer Dep.).  [Agreed]

Illustration below:

|                  Tight                   |                  Loose                  |
|                 (JX36-2)                 |                 (JX36-6)                |

 

### J.    POST-INCIDENT RESPONSE (INSURANCE, REPAIRS, ETC.)

319.    Various repairs were required following the August 2018 sea trial.  (Dkt. No. 174 at 19–22) (repairs were a tedious process; damage to wiring and electronics; circuit breakers had to come from Italy; generator issues; AC issues; etc.).  [Agreed]

320.    The insurance company for the Yacht was notified of the incident, and Fischer was involved with the process.  (Dkt. No. 181 at 22).  [Agreed]

321.    Captain Nicholls issued a Letter of Protest to FDDA stating, "On behalf of the Owners of M/Y Constance Joy I hereby hold Florida Detroit Diesel-Allison entirely responsible for damage sustained and liable for all costs and /or losses as a result of the incident."  (JX27); (JX82 at 269) (Captain Dep.).  Captain Nicholls testified that he still believes the seawater damage was caused by the negligent work of FDDA.  (JX82 at 290) (Captain Dep.).  [Agreed]

322.    Captain Nicholls's letter contained his signature, personal stamp, and the Yacht stamp.  (*Id.* at 269–70).  He spoke with Fischer, but did not speak with Skolnick following the event.  (*Id.* at 271).  [Agreed]

323.    Allister Dredge ("Dredge") was assigned by the vessel's insurer to inspect the incident and survey the damages.  (Dkt. No. 181 at 22, 102).  Dredge is a marine surveyor with 40 years of experience surveying yachts for insurance-damage purposes.  (JX85 at 8) (Dredge Dep.).  [Agreed]

324.    Dredge met with Captain Nicholls and Engineer Waugh when he attended on board the Yacht.  (*Id.* at 18)  [Agreed]

325.    Dredge surveyed the vessel and interviewed witnesses, including Captain Nicholls, Engineer Waugh, and someone from FDDA.  (*Id.* at 18, 25, 29, 110, 107). [Agreed]

326.    Dredge also took photos of the engine room and recreated the scene using blue tape to simulate the direction of the seaspray after the black rubber elbow hose popped off the white discharge pipe.  (JX37); (JX85 at 20–21, 29–30) (Dredge Dep.); (JX83 at 181) (Engineer Dep.).  [Agreed]



327.    Dredge's blue-tape recreation of the water spray was based on visual inspection of the damage of the water pattern and possibly based on a video from a camera in the engine room that recorded the release of water.  (JX85 at 19, 30) (Dredge Dep.).  [Agreed]

328.    Engineer Waugh testified that Dredge's photos accurately depicted the direction of the water spray to the control panels.  (JX83 at 180) (Engineer Dep.).  [Agreed]

329.    Dredge recorded his findings in a preliminary report issued on August 31, 2018.  (JX30). [Agreed]

330.    The report was prepared for the claims manager for the insuring entity. (JX85 at 24) (Dredge Dep.).  Dredge's preliminary report and summary of how the event occurred is contained in a "joint exhibit" that was admitted at trial by agreement of the Parties.

331.    Dredge reported the "occurrence" as FDDA providing service to the main engine heat-exchanger plates on May 29, 2018.  (JX30 at 2).  [Agreed]

332.    Dredge found the "cause of loss" to be "[f]ailure to secure the raw water hose to pipe clamps."  (*Id.* at 5).  [Agreed]

333.    Dredge spoke with witnesses, including Captain Nicholls, Engineer Waugh, and someone from FDDA.  (JX85 at 18, 25, 29, 107, 110) (Dredge Dep.).

334.    Dredge set an initial reserve for $425,000 for repair costs and described FDDA as the "at fault" party.  (JX30 at 6); (JX85 at 78) (Dredge Dep.).  Dredge did not amend or supplement his report.  (JX85 at 111) (Dredge Dep.).  [Agreed]

335.    Dredge did not testify or report as to who caused the "[f]ailure to secure the raw water hose to [the] pipe clamps."  (JX30 at 5); (JX85) (Dredge Dep.).

336.    Dredge reattended on board "multiple times" to "monitor [the] scope of repair and relating costs," and his role was to track costs.  (JX85 at 32:12–15, 42:2–6) (Dredge Dep.).  [Agreed]

337.    Repairs were initially estimated to take six weeks but lasted much longer. (Dkt. No. 181 at 22).  [Agreed]

338.    Captain Nicholls and Engineer Waugh gave recommendations on vendors/contractors for the repairs.  (Dkt. No. 174 at 19–20); (JX82 at 277–78) (Captain Dep.).  [Agreed]

339.    Dredge was not involved in the selection of service providers for quotes or work.  (JX85 at 35) (Dredge Dep.).  [Agreed]

340.    The main issue was everything having to do with the electrical panel, which was handled by RKO Electrical and completed in April of 2019.  (Dkt. No. 181 at 22). [Agreed]

341.    The electrical warranty was voided until an inspection could be done to verify that all electrical repair work was done correctly to allow Benetti to reinstate the electrical warranty.  (Dkt. No. 174 at 20–21); (Dkt. No. 181 at 25–26).

342.    Dredge tracked the repairs in a spreadsheet based on his review of estimates and invoices.  (JX85 at 38, 57–58) (Dredge Dep.); (JX32) (Dredge Invoice Summary); (JX120) (Dredge notes).  [Agreed]

343.    Dredge set up a Dropbox share folder for repair estimates and would check the estimates.  (JX85 at 40) (Dredge Dep.).  [Agreed]

344.    Dredge had no role in authorizing payments and was not a decision-maker on any payments; he simply tracked expenses.  (*Id.* at 56–57).  [Agreed]

345.    Engineer Waugh confirmed that, while repairs were underway in March of 2019, the vessel was still having priming issues on the starboard main engine.  (JX83 at 187) (Engineer Dep.).  [Agreed]

346.    Dredge did not track any costs for repair work related to the sea-spray incident on board the Yacht after May 6, 2019.  (JX85 at 97) (Dredge Dep.).  [Agreed]

347.    Dredge attended a sea trial on January 6, 2020, but performed no substantive work between May 2019 and January 2020 and performed no further work after the sea trial on January 6, 2020.  (*Id.*).  [Agreed]

348.    Dredge did not recall the January 6, 2020, sea trial or its results.  (*Id.* at 102). [Agreed]

349.    Firefly Engineering eventually certified the electrical work as complete, and the electrical warranty was re-established in May or June 2020.  (Dkt. No. 174 at 21); (Dkt. No. 181 at 22, 25–26).  [Agreed]

### K.    FDDA'S POST-INCIDENT COMMUNICATIONS

350.    Shortly after the incident, a meeting was held between Dredge, Fischer, representatives of FDDA, and various others.  (Dkt. No. 181 at 24).  [Agreed]

351.    Fischer testified that an FDDA representative stated that it wanted to pay for the repairs directly rather than go through insurance.  (*Id.*).

352.    On August 30, 2018, Engineer Waugh reported in an email to Captain Nicholls that "Max" from FDDA had attended the vessel on August 28, 2018, "to observe and take notes as to damages" and stated, "it was disappointing that [FDDA] did not check the hose clamps."  (JX33-18); (Dkt. No. 175 at 82–83).  Donohue acknowledged that Max Camargo, a senior technician for FDDA, went to the vessel after the engine room was flooded.  (Dkt. No. 175 at 82).  Jakubas acknowledged that Max Camargo was his supervisor.  (Dkt. No. 182 at 83).  [Agreed]

353.    Donohue testified at trial that it was FDDA's responsibility to tighten the hose clamps and that if the Court finds that FDDA did not tighten the hose clamps and that was the cause of the flood, then Donohue would imagine that would be FDDA's fault.  (Dkt. No. 175 at 83).  [Agreed]

354.    Donohue agrees that English was in the engine room on August 23, 2018 — the day before the sea trial — when English primed and ran the engines for 1.5 hours.  (*Id.* at 49).  Donohue further agrees that English's daily Acknowledgment report from that

day did not note any weeping or leaking. (JX101); (Dkt. No. 175 at 50). Donohue agrees that if weeping had occurred, English would have reported it. (Dkt. No. 175 at 50). He also agrees that if the hose clamps to the black rubber elbow hose had been loose, any leakage or weeping would have been hard to miss once the engines were running at idle at the dock. (*Id.* at 27). Donohue further agrees that FDDA's conjecture about unidentified weeping is contradicted by English's presence in the engine room while running the engines the day before the sea trial. (*Id.* at 50).

355.    On August 30, 2018, Donohue sent an email to Captain Nicholls to advise that "FDDA will be available to support the repairs from the water spray." (JX31). [Agreed]

356.    Dredge communicated with Donohue throughout the adjudication period and asked FDDA to advise if it would provide funding for the repairs. Specifically, on September 20, 2018, Dredge sent an email to Donohue asking if FDDA "will be providing funding" for repairs based on a summary of damages that Dredge had compiled from documents provided to him on the vessel. (JX110); (JX33-23); (JX85 at 52–53). [Agreed]

357.    FDDA was requested by Aaron Fischer to pay some money. (Dkt. No. 175 at 34–35). [Agreed]

358.    Between October 1, 2018, and January 3, 2019, FDDA made three payments to Mr. Skolnick for a total of $90,000. (Dkt. No. 174 at 29); (JX123–25). [Agreed]

359.    Donohue testified that the decision to pay was part of a goodwill gesture that FDDA expected to make back later from a good customer, as FDDA was aware that Skolnick had several boats and had a belief there would be a bigger boat added by Skolnick. (Dkt. No. 175 at 36–37). [Agreed]

360.    FDDA was not providing payments as an acknowledgment or acceptance of responsibility, but for "goodwill, commercial decision," "hoping for a long mutually beneficial relationship" not only with Skolnick but also "to please our other clients, MTU[,] and the boat builder." (*Id.* at 38–39). [Agreed]

361.    Checks were paid to Barry Skolnick on October 11, 2018, November 21, 2018, and January 13, 2019, at Mr. Donohue's request. (*Id.* at 35–36). [Agreed]

362.    On June 21, 2019, Donohue wrote to Skolnick at 109 North Avenue, Westfield, New Jersey 07090, advising that FDDA would like to consider the matter closed. (*Id.* at 73, 75). [Agreed]

363.    On August 28, 2019, Skolnick's lawyer at the time, Steve Schermer, responded by letter as follows: "Dear Mr. Donohue, I represent Barry Skolnick. I got your letter of June 21st, 2019, . . . . Constance Joy II remains inoperable, and my client continues

to incur damages as a result of the August 2018 event. Mr. Skolnick maintains all legal rights and remedies." (*Id.* at 74). [Agreed]

364.   FDDA's Mickey Wheeler wrote to Steve Schermer advising that FDDA is "committed to doing the right thing as we have demonstrated so far." (Dkt. No. 174 at 26–29); (JX29). Donohue was copied on FDDA's response letter. (JX29); (Dkt. No. 175 at 71). [Agreed]

365.   Donohue testified that FDDA's commitment to voluntary payments ended after FDDA made payments totaling $90,000. (Dkt. No. 175 at 71).

366.   Dredge returned to the vessel in January 2020 for a follow-up sea trial, but he did not generate any notes from this event. (JX85 at 99–102) (Dredge Dep.). [Agreed]

367.   The Parties agree that the "damage to the Yacht was caused because the fitting hose on the starboard engine broke loose and sprayed water through the engine room." (Dkt. No. 138 at 12) (Admission of Fact #29). The Court finds this fact was established at trial. [Agreed]

368.   The Court finds that Jakubas failed to tighten the metal O-ring clamps when he reconnected the black rubber elbow hose to the white discharge pipe after reinstalling the heat-exchanger plates on the starboard engine on May 31, 2018.

## L.   THIS LAWSUIT

369.   This case was originally filed in Florida state court on June 11, 2020. (Dkt. No. 1-1). FDDA subsequently removed the case to Florida federal court and then filed a motion to transfer venue based on the terms and conditions on the back of the May 29th SRO. (Dkt. No. 138 at 12) (Admission of Fact #31). [Agreed]

370.   The Florida federal district court transferred the case to this Court based on its preliminary finding at the pleading stage that a forum-selection clause was implicated. The case was initially assigned to U.S. District Judge Lynn N. Hughes. (*Id.*) (Admission of Fact #32). [Agreed]

371.   As part of the removal process, Donohue signed an affidavit under penalty of perjury on June 30, 2020, which was submitted as part of the record of this case, (Dkt. No. 1-2 at 11), stating FDDA's belief that the person who signed the May 29th SRO was Engineer Waugh, not Captain Nicholls, (Dkt. No. 175 at 80–82). Donohue agreed at trial that this statement was in error. (*Id.* at 81). [Agreed]

372.   Skolnick and Fischer allege that they first became aware of the May 29th SRO's Additional Terms of Sale only after the lawsuit was filed and FDDA moved to remove the case to federal court in Florida. (Dkt. No. 181 at 19–20); (Dkt. No. 174 at 126).

373.    Fischer found the terms and conditions on the back of the SRO to be uncommon for work orders in comparison to dozens and dozens of other work orders and invoices he has reviewed in this matter.  (Dkt. No. 181 at 21). [Agreed]

374.    Fischer never instructed Captain Nicholls or Engineer Waugh to advise third-party vendors that they lacked authority to sign work orders or agree to terms and conditions like FDDA's Additional Terms of Sale.  (*Id.* at 88–89).

375.    Donohue says that, in his 40 years of service, FDDA has not fought with its customers.  (Dkt. No. 175 at 38).  Public records show FDDA has previously litigated with a customer over the application of FDDA's terms and conditions.  *See Stewart & Stevenson, LLC v. Galveston Party Boats, Inc.,* No 01-09-00030-CV, 2009 WL 3673823 (Tex. App.—Houston [1st Dist.] Nov. 5, 2009, no pet.). [Agreed]

**M.    THE YACHT WAS SOLD IN 2021**

376.    After repairs were completed, Skolnick eventually sold the Yacht in 2021 for $14.3 million.  (Dkt. No. 174 at 22, 48, 96); (JX122).  [Agreed]

377.    After repairs were completed, the Yacht was never chartered to any third party.  The record is devoid of any evidence of Plaintiff's personal use of the vessel during and/or after repairs were completed.  [Agreed]

378.    Skolnick worked again with yacht broker Bob Fritzky from Marine Max to sell the boat.  (Dkt. No. 174 at 23).  [Agreed]

379.    The yacht market in 2021 had gotten better because of COVID and because boat supply was low.  (*Id.* at 24).  But early offers on the Yacht were extremely low.  (*Id.* at 23). [Agreed]

380.    The Yacht continues to operate today under the name Happy D.  (*Id.* at 22). [Agreed]

**N.    DAMAGES AT TRIAL**

381.    According to Skolnick, Plaintiff incurred a financial loss as a result of the August 2018 sea trial, including direct repair expenses, loss of charter, and loss of personal use for a two-year period of time.  (*Id.* at 24–25).  [Agreed]

382.    Both sides presented expert testimony on damages at trial.  Fischer testified as Plaintiff's damages expert, and Pierce Power testified as FDDA's rebuttal damages expert.  [Agreed]

### 1.    Aaron Fischer

383.    Fischer earned his accounting degree in 1971 and began employment for an accounting firm, where he worked in the audit and tax staff for six years and became head of the technical research and review department for two years. (Dkt. No. 181 at 12). Fischer then moved to a new role as the CFO in charge of accounting records for a hedge fund for 17 years. (*Id.* at 13–14). Fischer was then recruited to work for a much larger hedge fund before being approached by Skolnick to work for him. (*Id.* at 15). [Agreed]

384.    Fischer became CFO of BLS Assets Management and all of its subsidiaries, including Constance Joy II, LLC in 2014. (*Id.*); (Dkt. No. 180 at 76). As CFO, Fischer would interact with Burgess about the general management of the Yacht and its staff. (Dkt. No. 181 at 17). The Yacht crew was employed and paid by Burgess, but Fischer would review a report including the payroll numbers and administrative fees before preparing a wire payment to Burgess with Skolnick's approval. (*Id.*). Fischer also generally worked to build Skolnick's businesses, including financial forecasts while providing the details to Skolnick. (Dkt. No. 180 at 76). [Agreed]

385.    Fischer has no United States Coast Guard ("USCG") license, no marine engineering degree or license, never worked as a crew member on a yacht, never chartered a yacht, is not an expert in yacht maintenance, has no education in the operation of a yacht, and does not know the procedures for a sea trial. (Dkt. No. 181 at 70–72). [Agreed]

386.    Fischer was not a licensed Certified Public Accountant ("CPA") when he did work on this case. (*Id.* at 70). He performed any task requested by Mr. Skolnick and testified that "I would wash Mr. Skolnick's cars if he wanted me to." (*Id.* at 71). [Agreed]

387.    Fischer and Skolnick are cousins. (Dkt. No. 180 at 76). [Agreed]

388.    In reviewing and assessing the damages to the Yacht, Fischer personally considers every charge and cost from August 24, 2018, to June 2020 to be the fault of FDDA; but for the purposes of assessing damages in the lawsuit, Fischer did not attribute every charge or cost as a damage to FDDA. (Dkt. No. 181 at 26). This includes approximately $706,245.55 in expenses for crew compensation, crew insurance, vessel insurance, and Burgess management fees, which Fischer testified were necessary to maintain the vessel and keep it insured during the repair period. [Agreed]

### 2.    Pierce Power

389.    Power is a marine consultant for Martin & Ottaway, where he has worked for 30 years. (Dkt. No. 176 at 17). [Agreed]

390.    Martin & Ottaway has in turn worked with and against lawyers from the Chalos & CO PC law firm for 20 to 25 years. (*Id.* at 73). [Agreed]

391.    Power is not a captain of a vessel and has not served in that capacity.  (*Id.* at 86).  Power also has never served as the chief engineer of a vessel.  (*Id.*).  Power has never conducted a sea trial on a Benetti 125' like the Yacht.  (*Id.* at 86–87).  [Agreed]

392.    Power is not a CPA or accountant and does not have any education or experience in accounting or preparing financial projections or analysis.  (*Id.* at 90–91).  [Agreed]

393.    Power investigates casualties on board marine vessels, including luxury boats like the Yacht.  (*Id.* at 20).  His work includes loss surveys for insurance companies that provide hull and machinery insurance.  (*Id.*).  He also does adjustments for hull and machinery insurance claims by reviewing all the repair specifications and the repair invoices and commenting on their applicability to the actual casualty.  (*Id.* at 20–21).  [Agreed]

394.    Power has done hundreds of loss and adjustments projects and has been an expert in other litigation matters in federal court and other proceedings.  (*Id.* at 21).  [Agreed]

395.    Power never went to the Yacht.  (*Id.* at 81).  He never surveyed the Yacht.  (*Id.* at 86).  He did not interview Captain Nicholls, Engineer Waugh, or other members of the Yacht's crew.  (*Id.*).  Power also did not interview Jakubas.  (*Id.*).  [Agreed]

396.    Power testified that while "it's also very good to actually get to visit the vessel and see the vessel to get a firsthand view of," it was unnecessary here for "the opinions that I've given based on the documents presented."  (*Id.* at 26).  [Agreed]

397.    Power reviewed all evidence exchanged in discovery, including transcripts of all depositions conducted.  (*Id.* at 24–25).  [Agreed]

398.    Power reviewed various records related to the casualty to the Yacht, including invoices pertaining to repair costs.  (*Id.*).  Power also reviewed an assessment of invoices prepared by Dredge.  (*Id.*).  [Agreed]

399.    Power expected Plaintiff to maintain and expected to review engine-room logbooks, deck logbooks, alarm printouts, work-done records, maintenance records, photos/videos, visitor logs, and/or the Planned Maintenance System.  (*Id.* at 26–27).  [Agreed]

400.    Power agrees that he used Dredge's invoice summary as a benchmark for assessing damage.  (*Id.* at 91).  Power did not prepare his own summary or track the repair invoices independently of Dredge.  (*Id.*).  Power did not find anything that Dredge did to be incorrect, inaccurate, or outside the norm in Power's industry.  (*Id.*).  [Agreed]

401.    If an expense was on Dredge's invoice-summary spreadsheet, then Power called it a direct repair cost that is recoverable.  (*Id.* at 102).  [Agreed]

402.    Power also agrees that Dredge did not provide a final cost report.  (*Id.* at 92).  Power agrees that Dredge set a reserve of $425,000.  (*Id.*). [Agreed]

403.    In assessing repair invoices, Power made a determination as to whether a particular repair was "applicable" to the casualty.  By "applicable," Power means that the damages are causally related to the repairs arising from the sea-spray event that would typically be allowed under a hull and machinery policy claim.  (*Id.* at 95–99, 107).  Power agrees that reasonable marine surveyors can disagree as to what is a direct cost and what is not a direct cost.  (*Id.* at 112).  [Agreed]

404.    Any other damages are what Power calls "not related" or "not considered" because they are not expenses incurred as a result of the sea-spray incident and thus not typically allowed under a hull and machinery policy.  (*Id.* at 101, 107).  [Agreed]

405.    Power has no opinion as to whether these other "not related" types of damages are recoverable because they would be for the Court to decide.  (*Id.* at 101, 104–06).

### 3.    Four Categories of Damages

406.    Fischer testified to four categories of damages as follows: (i) Agreed Categories; (ii) Other Necessary Expenses; (iii) Net Loss of Charter Revenue; and (iv) Net Loss of Personal Use.  Fischer also testified to the application of a credit for amounts previously paid by FDDA.  These four categories of damages claimed by Plaintiff are depicted and described in further detail below.  [Agreed]

| Summary of Constance Joy's Damages | |
|---|---|
| Categories of Damages | Amount |
| Agreed Categories | $654,850.50 |
| Other Necessary Expenses | $96,920.69 |
| Net Loss of Charter Revenue | $1,285,875.00 |
| Net Loss of Personal Use | $1,930,945.00 |
| Credit for FDDA's Payments | ($90,000.00) |
| **TOTAL** | **$3,878,591.19** |

### 4.    Agreed Categories of Damages

407.    Fischer testified that there were $654,850.50 in Agreed Categories of Damages for a two-year period from August 24, 2018, to May 1, 2020.  [Agreed]

408.    The Agreed Categories of Damages encompass six subcategories of direct repair costs, which Fischer and Power agree on as to category, but not as to amount.  The

six Agreed Categories of Damages are for marina costs, electrical contractors (RKO Marine), crew housing, GBR Marine-Atlas Shore, towing, and detailing and cleaning. (Dkt. No. 181 at 37–38, 40–42, 49–50); (Dkt. No. 176 at 44, 103).  [Agreed]

409.    In assessing the nature and amount of the Agreed Categories of Damages, Fischer reviewed invoices, bank statements, and credit-card statements for Constance Joy II, LLC to determine what he called "hard costs."  (Dkt. No. 181 at 28).  Where Fischer was unable to find an invoice for a particular repair cost, he relied on bank and credit-card statements to establish that the expenses were incurred and paid.  (*Id.* at 34–36); (JX51–81) (compilation of bank accounts, credit-card accounts, and invoices); (PX141) (summary of direct repair costs).  [Agreed]

410.    Fischer created a summary of the six subcategories of direct repair costs contained within the Agreed Categories of Damages.  (PX141) (summary of direct repair costs); (Dkt. No. 181 at 34–35).  Fischer's overall assessment of the Agreed Categories of Damages is depicted in the chart below:

| Agreed Categories of Damages | |
| --- | --- |
| **Categories of Damages** | **Amount** |
| Marina | $314,766.75 |
| Electrical Contractor-RKO Marine | $233,764.15 |
| Crew Housing | $53,056.13 |
| GBR Marine-Atlas Shore | $30,826.47 |
| Towing | $15,437.00 |
| Detailing and Cleaning Damages | $7,000.00 |
| **TOTAL** | **$654,850.50** |

[Agreed]

48

411.　　Power's assessment of the "Agreed Categories" is summarized in DX154 and depicted in the chart below:

### Mr. Power's Analysis of Purported "Agreed Costs"

| Category | Plaintiff | Pierce Power* | Exhibit |
|---|---|---|---|
| RKO Electrical | $233,764.15 | $208,669.50 | JX 119<br>JX 66-36 |
| Crew Housing | $53,056.13 | $37,215.16 | JX 119 |
| Cleaning | $7,000.00 | $7,000.00 | JX 119 |
| GBR Marine | $30,826.47 | $30,826.47 | JX 119 |
| Marina | $314,766.75 | $89,734.60 | JX 119 |
| Towing | $15,437.00 | $1,000.00 | JX 119 |
| Subtotal | | $374,445.73 | |
| | | ($90,000.00) | Aaron Fischer |
| **TOTAL** | **$654,850.50** | **$284,445.73** | |

\* Mr. Power determined the period of repair to be August 28, 2018 – May 1, 2019

[Agreed]

412.　　Fischer's and Power's disagreement on the amount of the Agreed Categories of Damages is driven largely by their opposing views as to the time period for assessing the direct costs of repair to the Yacht. (Dkt. No. 181 at 49–50); (Dkt. No. 176 at 37–38, 45). [Agreed]

413.　　Fischer testified that the time period for assessing repair damages is the two-year period from August 24, 2018 (the date of the sea-spray event) to May 2020 (when Fischer testified that the electrical warranty for the Yacht was finally reinstated). (Dkt. No. 181 at 53). [Agreed]

414.　　Power testified that the time period for assessing repair damages is the eight-month period from August 24, 2018, to the end of April 2019, which is when Power testified RKO Marine submitted its last invoices for repairs to the Yacht's electrical systems. (Dkt. No. 176 at 37–38); (JX119) (Dredge spreadsheet); (JX66-36) (RKO invoice from April 2019). [Agreed]

415.　　Power admits that, in his line of work, assessing the repair period invariably requires talking with contractors to get a sense of how long the repairs will take. (Dkt. No. 176 at 93). Power also admits that he did not talk to any contractors in this case about

the work that was being done. (*Id.*). Power was unable to speak to whether an expense was necessary to reinstate the electrical warranty to the vessel. (*Id.* at 94). [Agreed]

416. The trial evidence shows that Captain Nicholls and Engineer Waugh recommended contractors for the repairs. (Dkt. No. 174 at 19–20); (JX82 at 277–78) (Captain Dep.). Many of those contractors were ultimately hired, and the record supports at least a reasonable inference that Fischer interacted with them to arrange payment of invoices.

417. However, Plaintiff presented no invoice for any work performed on any of the electrical systems between April 2019 and May 2020, and no such documents were identified in any of the discovery produced in this case. (Dkt. No. 176 at 40–44); (DX154) (Demonstrative). [Agreed]

418. Fischer calculated marina costs to be $314,766.75 based on invoices, bank statements, and credit-card statements admitted into evidence. (Dkt. No. 181 at 42–43); (JX68), (JX53–54); (PX141) (CONJOY002139). [Agreed]

419. Power calculated the marina costs during the period of repair for August 28, 2018, to May 1, 2018, to be $89,734.60. (Dkt. No. 176 at 46); (JX119); (DX154). [Agreed]

420. Fischer calculated electrical contractor expenses for RKO Marine to be $233,764.15 based on invoices, bank statements, and credit-card statements admitted into evidence. (Dkt. No. 181 at 38); (JX66). [Agreed]

421. Power calculated the RKO Electrical expenses to be $208,669.50 for the repair work performed. (Dkt. No. 176 at 46); (JX119); (JX66–36); (DX154). [Agreed]

422. Fischer calculated crew-housing expenses to be $53,056.13 based on invoices, bank statements, and credit-card statements admitted into evidence. (Dkt. No. 181 at 40–41); (JX51–56); (PX141) (CONJOY002133). [Agreed]

423. Power calculated the crew housing to be $37,215.16 for the repair work period. (Dkt. No. 176 at 46–47); (JX119); (DX154). [Agreed]

424. Fischer and Power calculated expenses for shore power from GBR Marine-Atlas Shore to be $30,826.47 based on invoices, bank statements, and credit-card statements admitted into evidence. (Dkt. No. 181 at 42); (JX68); (JX53–54); (PX141) CONJOY002139). [Agreed]

425. Fischer calculated towing expenses in the amount of $15,437.00 based on invoices, bank statements, and credit-card statements admitted into evidence. (Dkt. No. 181 at 41–42); (JX53–56); (PX141) (CONJOY002150). [Agreed]

426.     Power calculated the tow expenses to be $1,000.00 for the period of repair. (Dkt. No. 176 at 47); (JX119); (DX154).  [Agreed]

427.     Fischer and Power calculated detailing and cleaning expenses in the total amount of $7,000.00 based on invoices, bank statements, and credit-card statements admitted into evidence.   (Dkt. No. 181 at 41); (JX53–56); (PX141) (CONJOY002135). [Agreed]

428.     The Court finds that the evidence establishes the repair period spanned from August 24, 2018—the date of the sea-spray event—through May 2020, when Fischer testified that the Yacht's electrical warranty was reinstated.  The Court therefore finds that the total amount of damages to the Yacht for the Agreed Categories of Damages is $654,850.50.  This amount must be reduced by $90,000.00 to account for FDDA's prior payments to Skolnick.   Accordingly, the total amount for the Agreed Categories of Damages is $564,850.50.

### 5.     Other Necessary Expenses

429.     Fischer testified that there were $96,920.69 in Other Necessary Expenses for a two-year period from August 24, 2018, to May 1, 2020.  According to Fischer, Other Necessary Expenses encompass five additional subcategories of repair costs for air conditioning, Atlas converter, RPM Diesel, electrical consultants, and electrical survey, as depicted below.

| Other Necessary Expenses | |
|---|---|
| **Categories of Damages** | **Amount** |
| Electrical Repair and Consultants Other | $38,219.00 |
| RPM Diesel Generator | $25,153.05 |
| Electrical Survey for Warranty Purposes | $20,483.00 |
| Repair Atlas Converter | $9,481.12 |
| Repair Air Conditioning | $3,584.52 |
| **TOTAL** | **$96,920.69** |

[Agreed]

430.     Power does not agree on any of the items listed as Other Necessary Expenses regardless of timeframe.  Power testified that the Other Necessary Expenses should be reduced to $0.00 because there was no back up to determine how the expenses are applicable to the incident.  (Dkt. No. 176 at 52, 68).  [Agreed]

431.     To reach his conclusions on the Other Necessary Expenses, Fischer testified that he reviewed invoices, bank statements, and credit-card statements for Constance Joy II, LLC.  (Dkt. No. 181 at 28); (PX141) (summary); (JX51–81).  Where Fischer was unable

to locate an invoice, he relied on bank statements and credit-card statements to show that the charges were incurred and paid.  (Dkt. No. 181 at 34–35).  [Agreed]

432.    Fischer calculated $38,219.00 in expenses for electrical repairs and other consultants based on invoices, bank statements, and credit-card statements admitted into evidence.  (*Id.* at 47–48); (JX53–56); (PX141) (CONJOY002136).  But the Firefly Engineering invoice for $14,677.68 is dated two weeks before the sea-spray event and covers work performed between April 24 and August 9, 2018.  (Dkt. No. 176 at 63); (JX77).  Excluding that invoice, the total expenses for electrical repair and other consultants is $23,541.32.

433.    Fischer calculated expenses for RPM Diesel to be $25,153.05 based on invoices, bank statements, and credit-card statements admitted into evidence.  (Dkt. No. 181 at 47); (JX67); (JX51–56); (PX141) (CONJOY002149).

434.    Fischer calculated expenses for the electrical survey for warranty purposes to be $20,483.00 based on invoices, bank statements, and credit-card statements admitted into evidence.  (Dkt. No. 181 at 47–49); (JX53–56); (JX77); (PX141) (CONJOY002137).

435.    Fischer calculated repairs for the Atlas converter to be $9,481.12 based on invoices, bank statements, and credit-card statements admitted into evidence.  (Dkt. No. 181 at 46); (JX55–56); (PX141) (CONJOY002145).

436.    Fischer calculated expenses for air-conditioning repairs to be $3,584.52 based on invoices, bank statements, and credit-card statements admitted into evidence. (Dkt. No. 181 at 45–46); (JX55–56); (PX141) (CONJOY002144).

437.    The Court finds the evidence sufficient to show that the total amount of damages to the Yacht for the Other Necessary Expenses is $82,243.01.

### 6.    Loss-of-Charter Damages

438.    Fischer testified that the sea-spray incident and resulting repairs led to $1,285,875.00 in lost-charter revenue for the Yacht.  [Agreed]

439.    The Yacht was never chartered at any point in time during Skolnick's ownership.  It is undisputed that Plaintiff never chartered the Yacht and never received any offers to charter the Yacht from a third party.  [Agreed]

440.    In forming his opinion, Fischer reviewed the charter materials prepared by Burgess, including the market comparables to the "sister vessel" Skylar, projections for gross revenue the Yacht would generate, the net commission for Burgess, and the forecast of days to charter per season.  (JX42).  Fischer also reviewed historical charter revenue generated by the Skylar under a charter program with Burgess, which was provided to him by Maitland, the past owner of the Skylar.  (Dkt. No. 181 at 51).  Fischer also reviewed the past operating expenses required to run the Yacht.  Fischer then prepared a forecast

using this information and accounting for any time Skolnick would be using the vessel personally. Fischer believes his charter forecast is conservative. (*Id.* at 28–29). [Agreed]

441. Fischer never prepared a charter forecast at any time prior to use in litigation. [Agreed]

442. Based on the information reviewed, Fischer used the gross amount from Burgess for the Caribbean/Bahamas for the high season, $230,000, over 10 days. (PX143-A). Fischer subtracted the Burgess net commission of $43,125 for the high season from $230,000, giving a net profit of $186,875. Fischer then divided this number by the number of days (10 days in high season) to give the net rate per day during the high season of $18,687.50. (Dkt. No. 181 at 32); (PX143-A). [Agreed]

443. For the low season, Fischer used the Burgess low season gross amount for the Caribbean/Bahamas, $294,000, over 14 days. (PX143-A). Fischer then subtracted the Burgess net commission of $55,125 from the $294,000 to give a net profit of $238,875. Fischer then divided this number by the number of days (14 days in the low season) to give the net rate per day during the low season of $17,062.50. (Dkt. No. 181 at 32–33); (PX143-A). [Agreed]

444. In calculating the number of days for charter, Fischer first started on September 1, 2018, and went to May 31, 2020, giving a total time period of 21 months (or 639 days). (Dkt. No. 181 at 53). Fischer then mapped out the charter schedule using the Burgess information. The Burgess proposal predicted 85 days of charter per year, but Fischer only planned for 83 days of charter within 639 days, or approximately 45 days per year. (*Id.* at 53–54); (JX42). Fischer excluded the months during hurricane season. (Dkt. No. 181 at 58). [Agreed]

445. Fischer then planned approximately seven days of personal use per month (excluding hurricane season) and 14 days during the winter holidays for personal use, totaling 126 days out of the total 639 days. Thus, the total number of days the vessel would be operating would be 209 days out of 639 days. (*Id.* at 32–33); (PX143-A). [Agreed]

446. During the period of September 2017 – August 24, 2018, Skolnick never used the M/Y CONSTANCE JOY except for a single evening for a birthday party where the Yacht did not leave the dock. (Dkt. No. 174 at 95–96). [Agreed]

447. In calculating the operating expenses, Fischer took the total operating expenses over a 21-month period, $1,341,037, and divided by the total time period of 639 days to give an amount of $2,098.65 per day for operating expenses. (Dkt. No. 181 at 52–53, 59). Fischer then multiplied $2,098.65 by the 83 total days of charter to determine the charter operating expenses of $174,188. (*Id.* at 32–33); (PX143-A). [Agreed]

448.    In combining all these calculations, Fischer multiplied the low season rate of $17,062.50 per day times 56 total low season charter days for a total of $955,500.  Then, Fischer multiplied the high season rate of $18,687.50 per day times 27 total high season charter days for a total of $505,562.50.  Adding these two totals gives a gross total of $1,460,063 for charter.  Fischer then subtracted the $174,188 operating expenses for 83 days from the gross total to give the net profit for chartering for 83 days to be $1,285,875.  (Dkt. No. 181 at 32–33); (PX143-A).  [Agreed]

449.    The Court finds that no charter party agreement was signed or contemplated and that there is no evidence the Yacht was ever chartered.  Accordingly, the Court finds that the sea-spray incident did not result in any loss-of-charter damages.

### 7.    Personal Loss of Use

450.    Fischer testified that the sea-spray incident and resulting repairs led to $1,930,945 in value for lost personal use of the Yacht.  [Agreed]

451.    In forming his opinion, Fischer reviewed the charter projections from Burgess, including the gross revenue the boat would generate, the net commission for Burgess, and the forecast of days to charter per season.  (JX42).  Fischer also reviewed the past revenue from the "sister vessel" Skylar provided to him by Maitland.  (Dkt. No. 181 at 51).  Fischer also reviewed the past operating expenses required to run the vessel.  [Agreed]

452.    The calculations were not based on any actual charter hire earnings by Plaintiff for the Yacht.  There were no charter contracts for the use of the CONSTANCE JOY during the entire period that the Yacht was owned by Plaintiff.  [Agreed]

453.    Fischer met with Skolnick to determine his expected personal use of the Yacht outside of chartering and based on his business schedule.  (*Id.* at 28). Fischer also used his experience working with Skolnick for six years at that point, using his knowledge of Skolnick's schedule.  (*Id.* at 28, 56).  [Agreed]

454.    Following his once-in-a-lifetime trip around the Mediterranean on the vessel's maiden voyage in the summer of 2017, (Dkt. No. 180 at 91), Skolnick only used the Yacht one evening for the remainder of the year, September 2017 – December 2017, for a birthday party on December 30, 2017, when the Yacht remained dockside, (Dkt. No. 174 at 95–96).  [Agreed]

455.    Skolnick purchased the Yacht for personal use but did not have an opportunity to cruise on it between January 1, 2018, and August 24, 2018.  (Dkt. No. 180 at 77, 85–86); (Dkt. No. 174 at 120); (Dkt. No. 181 at 64–65).  He also did not have an opportunity to cruise on the Yacht after August 24, 2018, due to the sea-spray event that caused damage to the Yacht.

456.    In calculating the damages for personal use, Fischer used the charter value for the vessel based on the Burgess proposal ($18,687.50 per day for high season and $17,062.50 for low season).  (*Id.* at 55–56).  [Agreed]

457.    Fischer then planned approximately seven days of personal use per month (excluding hurricane season) and 14 days during the winter holidays for personal use totaling 126 days out of the total 639 days.  (*Id.* at 32–33, 58).  [Agreed]

458.    Fischer estimated Skolnick would have used the vessel 98 days out of 639 during the low season and multiplied that number of days by the low season rate ($17,062.50) to get $1,672,125.  Fischer planned for Skolnick to use the vessel 28 days out of 639 during the high season and multiplied that number of days by the high season rate ($18,687.50) to get $523,250.  Adding these two numbers together resulted in a gross total of $2,195,375 for loss of personal use.  (PX143-A).  [Agreed]

459.    Fischer then used the same operating expenses per day calculated from charter ($2,098.65 per day) and multiplied it by a total of 126 days out of 639 for personal use giving a total of $264,430 for operating expenses during this time period.  Fischer subtracted $264,430 from the personal use gross total, $2,195,375, giving a net amount of $1,930,946.  (Dkt. No. 181 at 59); (PX143-A).  [Agreed]

460.    Fischer did not overlap or "double count" any charter days with any "personal use" days in any given month.  (Dkt. No. 181 at 113–14).  For a typical 30-day month such as September 2018, Fischer only scheduled seven days of charter and seven days of personal use.  (*Id.* at 114).  Even for the busiest months such as January, Fischer only scheduled seven days of charter and 14 days of personal use.  (PX143-A). [Agreed]

461.    The Court finds the evidence establishes that the total damages for personal loss of use of the Yacht is $1,930,945.

## II.    CONCLUSIONS OF LAW

Based upon the above findings of fact, the record, and arguments of counsel at the bench trial, the Court enters the following conclusions of law. Any conclusion of law that should be construed as a finding of fact is adopted as such.

### A.    Negligence

462.    Plaintiff asserts a single claim for negligence against FDDA.  To establish maritime negligence, a plaintiff must establish a duty owed by the defendant, breach of that duty, injury, and a causal connection between the defendant's conduct and the plaintiff's injury.  *Penn Mar., Inc. v. Rhodes Elec. Servs., Inc.*, 41 F.Supp.3d 507, 516 (E.D. La. 2014).  [Agreed]

55

463.    An individual repairing a ship has a duty to exercise reasonable skill and care commensurate with the knowledge normally possessed by members of his profession.  *Id.* (citing *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 467 F.Supp. 1257, 1288 (E.D. La. 1978), *aff'd in part, modified in part, and rev'd in part*, 674 F.2d 401 (5th Cir. 1982)). The most notable factor used to determine the existence and scope of the duty of care owed is the foreseeability of the harm suffered by the complaining party.  *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010).  "The question of causation is a fact question for the jury, and the jury has broad latitude to infer causation from the circumstances surrounding an accident, especially when it is not possible to produce direct proof of causation."  *Crompton Greaves, Ltd. v. Shippers Stevedoring Co.*, 776 F.Supp.2d 375, 389 (S.D. Tex. 2011) (quoting *Alza Corp. v. Thompson*, No. 13-07-00090-CV, 2010 WL 1254610, at *8 (Tex. App.—Corpus Christi–Edinburg Apr. 1, 2010, no pet.)). "The plaintiff need not exclude all possibility that the accident occurred other than as he alleges.  Rather the plaintiff is only required to convince the jury by a preponderance of the evidence that the accident occurred as alleged."  *Id.* (quoting *Alza Corp.*, 2010 WL 1254610, at *8); *see also Coastal Bridge Co., LLC v. Heatec, Inc.*, 833 F.App'x 565, 571 (5th Cir. 2020) (per curiam) ("Plaintiffs need not negate all other possible causes.  Proof that excludes other reasonable hypothes[e]s of a cause with a fair amount of certainty so that it is more probable than not that the fire was caused in a particular manner or scenario is enough to establish liability." (citation modified)).  [Agreed]

464.    It is undisputed that Jakubas worked for FDDA, that he was dispatched to the vessel to perform services on the heat-exchanger plates on May 29, 2018, and that he did in fact perform such work, including removal of the heat-exchanger plates and the black rubber elbow hose with metal O-ring clamp on the starboard side.  The Court therefore concludes that FDDA, through Jakubas, owed Plaintiff a duty of care when performing services on board the vessel.  [Agreed]

465.    It is also undisputed that, during the August 24th sea trial, the black rubber elbow hose dislodged from the upper white pipe on the starboard main engine due to loose hose clamps.  This in turn allowed seawater to spray into the engine room, which caused damage to the vessel.  [Agreed]

466.    The Court concludes that the greater weight of credible evidence shows that the black rubber elbow hose dislodged from the upper white pipe because Jakubas failed to tighten the metal O-ring clamps after reconnecting the hose during the installation of the heat-exchanger plates on the starboard engine on May 31, 2018.

467.    The Court further concludes that there is no credible evidence that any other person loosened or removed the black rubber elbow hose on the starboard side after Jakubas's work on May 31, 2018.

468.    Accordingly, the Court concludes that FDDA's negligence caused Plaintiff's damages.

**B.** **WHETHER THE MAY 29TH SERVICE REPAIR ORDER IS ENFORCEABLE TO LIMIT FDDA'S LIABILITY**

469.    FDDA asserts that the May 29th SRO is a valid and enforceable contract between FDDA and Plaintiff.  The SRO contains a limitation-of-liability clause at Clause 14 that disclaims "incidental, reservoir, pollution, special, exemplary, indirect or consequential damages, including without limitation loss of use, revenues, profits, or other opportunities" and further limits FDDA's maximum liability for any claim by Plaintiff to "the purchase price of the Products on which the claim is based."  (JX 91, Clause 14).  Captain Nicholls had apparent authority as the Captain of the M/Y CONSTANCE JOY to enter into the contract, and Plaintiff is therefore bound by the May 29th SRO's Additional Terms of Sale.

470.    FDDA's contention that Clause 14's limitation of liability binds Plaintiff is an affirmative defense.  (*See* Dkt. No. 138 at § 9.B) (Defendant's Contested Issues of Law).  FDDA thus had the burden of proof at trial.  (*See id.*)  [Agreed]

**1.** **Agency Relationship**

a.    Actual Authority

471.    FDDA's defense of actual authority is no longer at issue.  In their January 25, 2024, Joint Pretrial Order, the Parties agreed that "Captain Nicolls did not have actual authority to bind Plaintiff to the Additional Terms of Sale on the back of the May 29th SRO."  (Dkt. No. 138 ¶ 8(1)).

472.    The Court also found in its August 30, 2024, Memorandum Opinion and Order that "FDDA ha[d] apparently abandoned the argument that any agent (Engineer Waugh or Captain Nicholls) had actual authority."  (Dkt. No. 156 at 11).  Even if actual authority remained in dispute, the Court's summary-judgment Order concluded that "neither Engineer Waugh nor Captain Nicholls had actual authority to bind Constance Joy II, LLC" based on the terms of their employment contracts.  (*Id.*); (JX11) (Captain contract); (JX12) (Engineer contract).

473.    Accordingly, the issue of actual authority has been resolved both by the Parties' stipulation and the Court's prior summary-judgment ruling.  (Dkt. No. 156).  It is no longer at issue.

b.    Apparent Authority

474.    The issue of apparent authority remains in dispute.

475.    "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal *and* that belief is traceable to the

principal's manifestations." Restatement (Third) of Agency § 2.03 (A.L.I. 2006) (emphasis added); (*see* Dkt. No. 156 at 11) ("The Fifth Circuit looks to the Restatement of Agency as a source of general agency law to be applied in admiralty cases."). "As explained by the Fifth Circuit, apparent authority must be rooted in some manifestation by the principal that causes the third person to believe that the agent is authorized to act for him or the principal should realize that his conduct is likely to create such a belief." (Dkt. No. 156 at 12); *see Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985). [Agreed]

476.    "It is well established in the general maritime law that the master of a vessel is the agent and representative of the owner and as such can bind the owner by acts performed within the scope of the agency." *Jackson Marine Corp. v. Blue Fox*, 845 F.2d 1307, 1309–10 (5th Cir. 1988) (citing *Mass. Lobstermen's Ass'n, Inc. v. United States*, 554 F.Supp. 740, 742 (D. Mass. 1982)); *see Farmer v. The O/S Fluffy D*, 220 F.Supp. 917, 920 (S.D. Tex. 1963) ("The master is the representative of the owner and his actions are those of the owner.").

477.    There were only two individuals on board the Yacht who were crew members of the M/Y CONSTANCE JOY: Engineer Waugh and Captain Nicholls. Jakubas testified that he personally knew Waugh by name and rank. Accordingly, the Court finds that Jakubas's expectation and belief that Captain Nicholls was the individual who met him—and whom he saw read, review, sign, and photograph the May 29th SRO—is sufficient to establish that he was the Captain of the Vessel. (Dkt. No. 182 at 21–23). Captain Nicholls never informed FDDA that he lacked the authority to sign the SRO, and he signed and initialed the document three times, including above the line confirming that he was a "customer or authorized agent."



478.    Custom and practice in both the marine industry and aboard the Yacht confirm that Captain Nicholls was the captain, held himself out as such, was reasonably believed to be the captain, and acted as an "authorized agent" of the vessel with the authority to sign contracts and agree to their terms.

479.    Jakubas testified that vessel captains sign the majority of SROs and that, in his experience, they are almost always signed by the captain—or occasionally the chief

engineer. He credibly testified that Captain Nicholls signed the May 29th SRO, a fact corroborated by Captain Nicholls at his own deposition. That conclusion is further supported by Captain Nicholls's submission of a $7,200 credit-card authorization using Plaintiff's corporate credit card—an action he would not have been permitted to take without authorization from the Yacht's owner or its managers. (JX82 at 190–92); (*see also* JX19) (credit-card authorization sent by "Anthony J. Nicholls, M.C.A. Master of Yachts"); *and* (JX132) (credit-card receipt for charge to Plaintiff's corporate credit card on May 31, 2018).

480. The Court finds that FDDA reasonably relied on Captain Nicholls's role as the captain of the Yacht and that it was reasonable for FDDA to believe that he had the authority to sign the May 29th SRO.

481. A captain, as the highest-ranking person aboard a vessel, has the authority to execute contracts on behalf of the vessel's owner, who is then bound by those terms. *See Houseman v. Cargo of the Schooner North Carolina*, 40 U.S. 40, 45, 10 L.Ed. 653 (1841); *Jackson Marine Corp.*, 845 F.2d at 1309–10; *Harrison v. S/V Wanderer*, 25 F.Supp.2d. 754, 759 (S.D. Tex. 1998).

482. "The ship's master or other person, such as a charterer, to whom the vessel is entrusted is presumed to have authority to purchase necessaries to the credit of the vessel." *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 224 (5th Cir. 1999) (quoting *Ferromet Res. v. Chemoil Corp.*, 5 F.3d 902, 904 (5th Cir. 1993)). The presumption binds an owner to pay for the necessaries unless rebutted. *Id.* at 224–25.

483. Courts have held that a captain has apparent authority to engage service providers. *See, e.g., Rybovich Boat Co., LLC v. M/Y Blue Star*, 546 F.Supp.3d 1270, 1277 (S.D. Fla. 2021) ("Thornburn captained the Yacht. As master of the vessel, he had the authority to procure necessaries (like supplies and repairs)."); *Epstein v. Corporacion Peruana de Vapores*, 325 F.Supp. 535, 537 (S.D.N.Y. 1971) (observing that "the master of a vessel possesses full authority to make purchases binding upon the vessel's owner for 'necessaries' to be used on board his own ship unless the contrary is clearly stated to all concerned").

484. According to Skolnick, Captain Nicholls was responsible for maintaining the Yacht and arranging for third-party service providers to service the vessel under his authority. At the time of the May 29th SRO, the Yacht had just experienced an emergency loss of power on its first sea trial after five months of repairs. Captain Nicholls had authority to hire FDDA, and Fifth Circuit precedent makes clear that a vessel owner can be bound by a service contract executed by the vessel's captain, including limitation-of-liability clauses. *See, e.g., Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 582 (5th Cir. 1986) ("Third, the [ship]'s captain acted within the scope of his authority in signing the repair contract containing the red letter clause. A ship's captain is master of his vessel in every sense of the word. He has broad authority and

59

responsibility in the ship's successful operation.  He has implied authority to enter into agreements to ensure proper care for the ship and its crew.  We, therefore, hold [the ship's owner] bound by Captain Lucky's action."); *see also Powers Marine Serv. LLC v. Nauti Cat Charters, LLC*, No. 1:12-CV-20333, 2012 WL 1290598, at *20 (S.D. Fla. Aug. 2, 2012) ("It is well settled that the Captain or Master of a vessel may execute a contract on behalf of the owner of the vessel.").

485.    The Fifth Circuit has held that limitation-of-liability clauses that exclude certain causes of action or limit total liability are enforceable against a vessel's owner when entered into by its captain acting within the scope of his apparent authority.  *Coastal Iron Works*, 783 F.2d at 582.

486.    The evidence at trial confirmed that Captain Nicholls had the authority of Skolnick, Fischer, and Burgess to call FDDA for the service repair, sign the May 29th SRO, issue the credit-card deposit authorization, and pay for the repair work.  Indeed, as Plaintiff acknowledges, "There has never been any dispute that Captain Nicholls had Plaintiff's authority to engage FDDA to perform the engine repair, and to pay FDDA for its work using the vessel's credit card."  (Dkt. No. 198 at 10).

487.    Plaintiff nevertheless argues that Captain Nicholls lacked "apparent authority to *also* bind Plaintiff to *additional* terms beyond the repair/payment in these circumstances—specifically, to bind Plaintiff to the limitation of liability terms in Clause 14."  (*Id.*) (emphasis in original).

488.    Plaintiff's argument misses the mark.  "[A]uthority to make a contract is inferred from authority to conduct a transaction, if the making of such a contract is incidental to the transaction, usually accompanies such a transaction, or is reasonably necessary to accomplish it."  Restatement (Second) of Agency § 50 (1958).  Similarly, "authority to make a specified contract includes authority: (a) to make it in a usual form and with usual terms . . . and (b) to do other acts incidental to its making which are usually done or . . . are reasonably necessary for making it."  *Id.* § 51; *see also id.* § 49 (noting that the "rules applicable to the interpretation of authority" also apply "to the interpretation of apparent authority," except that manifestations by the principal to the other party in the transaction are interpreted in light of what the other party knows or should know, rather than on "what the agent knows or should know").

489.    Put simply, "authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it."  *Id.* § 35.  Thus, if Captain Nicholls had the "authority to engage FDDA to perform the engine repair," (Dkt. No. 198 at 10)—as Plaintiff concedes—then he also had the authority to do so in the usual manner, including executing a standard contract containing standard terms like a limitation-of-liability clause.

490.    Accordingly, the Court concludes that Captain Nicholls had apparent authority to sign and agree to the May 29th SRO and Additional Terms of Sale, including the limitation-of-liability clause in Clause 14.

## 2.    Enforceability of the Limitation-of-Liability Clause

491.    "While exculpatory clauses—commonly referred to as red letter clauses— were traditionally disfavored by courts sitting in admiralty, such clauses are today routinely enforceable." *La Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico, Inc.*, 124 F.3d 10, 19 (1st Cir. 1997) (citation omitted); *see also Coastal Iron Works*, 783 F.2d at 582.

492.    "A shipyard contract limiting liability will be upheld so long as the parties to the contract have more or less equal bargaining strength." *Coastal Iron Works*, 783 F.2d at 583 (citing *Todd Shipyards Corp.*, 674 F.2d at 410).

493.    The Court concludes that Skolnick, an experienced boater of 40 years who employed a professional captain, had roughly equal bargaining strength with FDDA. Even if FDDA had superior bargaining power, the Court finds no evidence that it exerted that power in this transaction. *See Sander v. Alexander Richardson Invs.*, 334 F.3d 712, 720 (8th Cir. 2003) ("There must be some evidence that the party holding the superior bargaining power exerted that power in overreaching the less sophisticated party by, for example, engaging in fraud or coercion or by insisting on an unconscionable clause.").

494.    "There is a split in the circuit courts of appeals on the issue of whether, under admiralty law, an exculpatory clause (also called a red letter clause) that fully absolves a party from liability for its own negligence is enforceable." *Id.* at 715.  The Fifth Circuit has upheld maritime contract clauses that fully exculpate a party from its own negligence. *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 540 (5th Cir. 1986); *see also Royal Ins. v. Sw. Marine*, 194 F.3d 1009, 1014 (9th Cir. 1999) ("[E]xcept in towing contracts, exculpatory clauses are enforceable even when they completely absolve parties from liability for negligence." (footnote omitted)); *Sander*, 334 F.3d at 717–21 (surveying the caselaw on this issue and concluding that "the doctrine prohibiting a party from completely absolving itself from liability for its own negligence is limited to circumstances involving relationships similar to towage agreements, such as bailment, employment, or public service relationships.").  Other circuit courts, however, have enforced red-letter clauses in maritime contracts—especially ship-repair contracts—only if they do not absolve all liability and still provide a deterrent to negligence. *Diesel "Repower," Inc. v. Islander Invs. Ltd.*, 271 F.3d 1318, 1324 (11th Cir. 2001); *La Esperanza,* 124 F.3d at 19.

495.    The Court finds that the limitation-of-liability clause at issue does not fully absolve FDDA of liability and still provides a deterrent to negligence. *See Marine Diesel Specialists, Inc. v. M/Y "BG3,"* No. 0:18-CV-60037, 2020 WL 2929839, at *10 (S.D. Fla. Jan. 17, 2020) (finding that a red-letter clause limiting liability to the invoice amount provided

a deterrent to negligence).  In the alternative, the Court concludes that under *Theriot*, 783 F.2d at 540—and for the reasons outlined in *Sander*, 334 F.3d at 717–21—the limitation-of-liability clause is enforceable even if it offers no deterrent.

496.    Finally, "it is universally agreed that exculpatory clauses, whether fully exonerating a party from its own negligence or not, must 'be clearly and unequivocally expressed.'"  *Id.* (quoting *Randall v. Chevron U.S.A., Inc.*, 13 F.3d 888, 905 (5th Cir. 1994)).  The first sentence of the red-letter clause provides in relevant part that neither party "shall have any liability to the other for any incidental, . . . indirect or consequential damages, including without limitation loss of use, revenues, profits or other opportunities, arising from the purchase or sale of Products, the use, operation or consumption of Products, any breach of warranty or the failure of any party to perform this agreement." (JX91 at 3) (emphasis and capitals omitted).  The second sentence states that "Seller's maximum liability for any claim by Buyer shall not exceed the purchase price of the Products on which the claim is based."  (*Id.*) (emphasis and capitals omitted). Elsewhere, the contract states that "'Products' means Goods and/or Services" and that "'Goods' means the machinery, equipment and other tangible and intangible property along with associated labor, installation and commissioning provided by Seller; [and] the term 'Services' means labor and associated parts provided by Seller to maintain, repair or recondition the property of Buyer." (*Id.* at 2).  The Court concludes that this clearly and unequivocally expresses both a limitation on the *type* of recoverable damages (limiting recoverable damages to direct damages) and on the *amount* of recoverable damages (limiting recoverable damages to the purchase price of FDDA's services).  The Court also concludes that Captain Nicholls had notice of the terms.  *Cf. Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1118, 1127 (5th Cir. 1992) (enforcing exculpatory terms found on the back of a purchase order under maritime law); *One Beacon Ins. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 270 (5th Cir. 2011) (enforcing an exculpatory clause in a maritime service-repair order even though the terms were contained online and only incorporated by reference).

497.    Accordingly, the Court concludes that the limitation-of-liability clause is enforceable under maritime law.

498.    The Court has found or concluded that (1) Captain Nicholls signed the May 29th SRO, *see supra* ¶ 224; (2) that SRO and FDDA's Additional Terms of Sale were presented to him as an integrated document, *supra* ¶ 225; (3) he had apparent authority to agree to the SRO and Additional Terms of Sale, *supra* ¶ 489; and (4) the limitation-of-liability clause is enforceable, *supra* ¶ 496.  Accordingly, the Court concludes that Plaintiff is bound by the May 29th SRO's Additional Terms of Sale, including the limitation-of-liability clause at Clause 14.

### 3.    Ratification

499.    FDDA's affirmative defense of ratification is no longer at issue in this case. FDDA previously moved for summary judgment on this ground, and the Court found there were genuine issues of material facts on this issue.  However, FDDA did not present any evidence or argument on this affirmative defense at trial.  (*See* Dkt. No. 156 at 14). Therefore, the Court concludes that FDDA has abandoned its defense of ratification, and it need not be decided by the Court.  [Agreed]

### C.    WHETHER THE ECONOMIC-LOSS RULE BARS PLAINTIFF'S NEGLIGENCE CLAIM

500.    FDDA's economic-loss defense is no longer at issue.  In its August 30, 2024, Memorandum Opinion and Order on summary judgment, the Court held that "even assuming the presence of an enforceable contract, the economic loss rule would not preclude Constance Joy II, LLC's claims."  (*Id.* at 14).  "Thus, the economic loss rule is inapplicable, should the Court ultimately find there to be a binding contract."  (*Id.* at 17). To the extent FDDA continues to assert the economic-loss doctrine, that defense is denied as a matter of law.

### D.    PLAINTIFF'S DAMAGES

### 1.    Whether Plaintiff's Damages are Limited to the Value of the Contract

501.    FDDA argues that "Plaintiff's quantum of damages recoverable in this matter (if any) are limited to the value of the contract, $10,000.62, consistent with Clause 14 of the SRO."  (Dkt. No. 138 at 7).

502.    Clause 14 consists of two sentences.  The first disclaims liability "for any incidental, . . . indirect or consequential damages, including without limitation loss of use, revenues, profits or other opportunities, arising from the purchase or sale of Products, the use, operation or consumption of Products, any breach of warranty or the failure of any Party to perform this Agreement . . . ."  (JX91) (emphasis and capitals omitted).  The second states that "Seller's maximum liability for any claim by Buyer shall not exceed the purchase price of the Products on which the claim is based."  (*Id.*).  FDDA's argument rests on this second sentence.

The Additional Terms of Sale included a warning at the top of the first page notifying the reader that the SRO was subject to a limitation of liability.

> The following Additional Terms of Sale apply except to the extent they are contradicted elsewhere in this Agreement.
> IMPORTANT WARRANTY, LIMITATION OF LIABILITY AND INDEMNITY PROVISIONS ARE INCLUDED.

Immediately after, Clause 1 states:

> **DEFINITIONS:** The term "Seller" means the Stewart & Stevenson affiliate executing this Agreement; "Goods" means the machinery, equipment and other tangible and intangible property along with associated labor, installation and commissioning provided by Seller; the term "Services" means labor and associated parts provided by Seller to maintain, repair or recondition the property of Buyer; "Products" means Goods and/or Services; and "Buyer" means the person to whom such Products are sold. Each of Buyer and Seller is a "Party."

(JX91, Clause 1). Clause 14 incorporates the defined term for "Products." Clause 14 incorporates the defined term for Products. (*Id.* at 2–3).

503.    Courts interpret contract terms based on the four corners of the document. Where, as here, a term is contractually defined, the court applies the definition agreed to by the parties. *Ingalls Shipbuilding v. Fed. Ins.*, 410 F.3d 214, 220 (5th Cir. 2005) (courts do not reach beyond the four corners of the document to explore the parties' intent).

504.    The May 29th SRO provides notice of the limitation of liability, and Clause 14 excludes liability for all claims

> . . . arising from the purchase or sale of Products, the use, operation or consumption of Products, **any breach of warranty or the failure of either Party to fully perform this Agreement, even if a Party was aware of the possibility of the other Party sustaining such damages,** and even if the remedy provided herein for a breach fails of its essential purpose or a breach is total and fundamental . . . .

(JX 91, Clause 14) (emphasis added and capitals omitted)).

505.    Clause 14 is unambiguous and excludes specified categories of claims and limits the maximum recoverable damages. The Court finds Clause 14 enforceable and applicable to this case.

506.    Clause 14 bars Plaintiff from recovering incidental, indirect, or consequential damages and caps any direct damages to $10,000.62.

## 2.    Whether Plaintiff Is Entitled to Direct Damages

507.    "Direct damages are those that the breaching party is conclusively presumed to have foreseen as a result of its breach because they are the necessary and

usual result of, and flow naturally and necessarily from, that wrongful act." *In re GGI Holdings, LLC*, 665 B.R. 727, 764 (Bankr. N.D. Tex. 2024) (citing *S.A. River Auth. v. Aus. Bridge & Rd., L.P.*, 601 S.W.3d 616, 631 (Tex. 2020)). "In contrast, consequential damages are those that result naturally, but not necessarily, from the defendant's breach, and are not the usual result of the wrong." *Id.* (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997)). [Agreed]

508.    The Court concludes that Plaintiff's Agreed Categories and the Other Necessary Expenses are *not* incidental, indirect, or consequential damages—they are direct damages. *See J & D Towing, LLC v. Am. Alternative Ins.*, 478 S.W.3d 649, 656 (Tex. 2016) (recognizing that "reasonable costs of such replacements and repairs as are necessary to restore the damaged article to its condition immediately prior to the accident" are direct damages). [Agreed]

509.    By adding Plaintiff's damages for the Agreed Categories of Damages ($564,850.50, *supra* ¶ 428) and Other Necessary Expenses ($82,243.01, *supra* ¶ 437), the Court finds that Plaintiff proved $647,093.51 in direct damages, *see supra* ¶ 508 (concluding that both fall within the scope of direct damages).

510.    Even so, the Court concludes that Plaintiff's recovery for these damages is limited to $10,000.62 (the invoice amount for the repair order) by the limitation-of-liability clause.

### 3.    <u>Whether Plaintiff Is Entitled to Loss-of-Charter Revenue</u>

511.    The Court concludes that loss-of-charter damages are not recoverable as a matter of law.

512.    To recover loss-charter profits, Plaintiff must prove damages with reasonable certainty. *Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1140-42 (5th Cir. 1994). Damages for lost charter profits during the period of repairs after a maritime tort are allowed only "when profits have actually been, or may reasonably [be shown] to have been lost, and the amount of such profits is proved with reasonable certainty." *Dow Chem. Co. v. M/V Roberta Tabor*, 815 F.2d 1037, 1042 (5th Cir. 1987); *see Houseman v. Cargo of the Schooner North Carolina*, 40 U.S. 40, 45, 10 L.Ed. 653 (1841); *Jackson Marine Corp.*, 845 F.2d at 1309–10; *Harrison v. S/V Wanderer*, 25 F.Supp.2d. 754, 759 (S.D. Tex. 1998). Plaintiff has not met this standard. The Court finds that the Yacht was never chartered to any third party, there was never a signed charter agreement, and there was never a signed charter-yacht-management agreement with Burgess to even offer the Yacht for charter.

513.    The burden is on the vessel owner "to prove, with reasonable certainty, that profits had actually been, or may reasonably be supposed to have been, lost." *Cent. State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1376 (11th Cir. 2000). The

owner must prove not only the opportunity to charter the vessel but also "that he would have availed himself of [the opportunity]." *Skou v. United States*, 478 F.2d 343, 346 (5th Cir. 1973) (quoting *The North Star*, 151 F. 168, 175 (2d Cir. 1907)). Plaintiff has not carried that burden. The Yacht was never chartered before or after the August 24, 2018, sea-spray incident and was never under contract for charter to any third party at any time.

514.    At trial, Plaintiff failed to establish any basis for loss of charter hire. The Court finds that the evidence in the record shows there was never a signed agency agreement between Burgess and Plaintiff or Skolnick to permit the marketing of the vessel for charter to third parties. There is no evidence in the record to suggest that Plaintiff ever had any expectation or intention to charter the Yacht because Skolnick did not attempt to charter the Yacht during the high season for the Bahamas during the period of December 2017 – April 2018. (Dkt. No. 174 at 112:14–114:2). During the period of time that the Yacht was owned by Constance Joy II, Limited, the vessel was never chartered out to any third party. (Dkt. No. 181 at 112:2-2). The Yacht could not be chartered to a third party for hire because it lacked the necessary safety equipment, the proper classification, and the proper insurances, and there was no evidence of any ready, able, or willing charterers presented. Moreover, the Yacht was never functional and never chartered from its delivery in 2017 through the August 24, 2018, sea-spray event.

### 4.    Whether Plaintiff Is Entitled to Loss of Personal Use

515.    As previously noted, the Court finds that the total damages for personal loss of use for the Yacht are $1,930,945. *Supra* ¶ 461. But the Court need not decide whether these damages are recoverable under admiralty law because the Court finds that they are barred by the limitation-of-liability clause.

### 5.    Comparative Fault

516.    It is FDDA's burden to prove that Plaintiff was comparatively at fault for the sea-spray incident. The Court finds that FDDA has not carried that burden.

### 6.    Pre-judgment Interest

517.    The Court concludes that Plaintiff is entitled to pre-judgment interest.

518.    The Fifth Circuit has held that "an award for prejudgment interest in actions under the general maritime law is the rule rather than the exception; prejudgment interest must be awarded unless unusual circumstances make an award inequitable." *Transcon. Gas Pipe Line Corp. v. Societe D'Exploitation du Solitaire SA*, 299 F.App'x 347, 352–53 (5th Cir. 2008) (per curiam) (quoting *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 492 (5th Cir. 1986)). [Agreed]

519.    In federal court, pre-judgment interest is usually awarded from the date of accident. *See id.* at 353 (citing *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 593

(5th Cir. 1986) (holding that interest will usually be awarded in [the Fifth] Circuit from the date of the incident)); *Paragon Asset Co. Ltd. v. Gulf Copper & Mfg. Corp.*, 622 F.Supp.3d 360, 424–25 (S.D. Tex. 2022) (stating that the interest "on repair costs runs from the date of the accident even though the owner does not pay these costs until some later date" (quoting *Ryan Walsh Stevedoring Co.*, 792 F.2d at 493)), *aff'd sub nom. Paragon Asset Co., Ltd. v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc.*, 99 F.4th 736 (5th Cir. 2024). [Agreed]

520.    Courts have broad discretion in setting the appropriate pre-judgment interest rate in an admiralty case.  *In re Grand Famous Shipping Ltd.*, No. 4:18-CV-02046, 2024 WL 4274874, at *2 (S.D. Tex. Sept. 24, 2024).  Courts may look to "state law or other reasonable guideposts indicating a fair level of compensation."  *Id.* (quoting *Marine Overseas Servs., Inc. v. Crossocean Shipping Co.*, 791 F.2d 1227, 1236 (5th Cir. 1986); *see also Marine Overseas Servs., Inc.*, 791 F.2d at 1236 (holding that district court did not abuse its discretion by looking to the Texas statutory pre-judgment interest rate for "accounts and contracts" in determining a 6% interest rate).  [Agreed]

521.    Under Texas law, unless there is specific contract language, pre-judgment interest is calculated at the post-judgment interest rate and is computed as simple interest.  Tex. Fin. Code §§ 304.103–.104.  The post-judgment interest rate is "the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation," unless that rate is less than 5% or more than 15%.  Tex. Fin. Code § 304.003(c).  Accordingly, Texas sets a floor and ceiling for pre- and post-judgment interest rates.  *Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011) (citing *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W. 3d 238, 255 (Tex. 2008)).  The current prime rate is 7.5%.[3] [Agreed]

522.    In *Grand Famous Shipping*, the court determined the best method was to take the average of the prime rate throughout the accrual period.  2024 WL 4274874, at *2.  The court found that this method best accomplished the purpose of pre-judgment interest, which is "compensation for the use of funds to which the claimant was rightfully entitled."  *Id.* (quoting *Marine Overseas Servs., Inc.*, 791 F.2d at 1236).  [Agreed]

523.    The Court finds that Plaintiff is entitled to pre-judgment interest at a rate of 6.29%—the average prime rate from August 2018 to the present after accounting for the Texas Finance Code's statutory floor of 5%.[4]  This interest shall be calculated as simple

---

[3]    *See Selected Interest Rates (Daily) – H.15*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreserve.gov/releases/h15/; *see also Interest Rates*, Tex. Off. of Consumer Credit Comm'r, https://occc.texas.gov/publications/interest-rates.

[4]    *See* FedPrimeRate.com, Prime Rate History: https://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm.

interest from August 24, 2018 (the date of the sea-spray incident) through the day before entry of judgment against FDDA.  *See* Tex. Fin. Code § 304.104.

### 7.    Post-judgment Interest

524.    The Court also concludes that Plaintiff is entitled to post-judgment interest. [Agreed]

525.    Post-judgment interest is awarded as a matter of course on any money judgment in a civil case recovered in a civil district court.  *See Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 173 (5th Cir. 2010); *see also* 28 U.S.C. § 1961(a) (2006).  The post-interest interest rate is equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding.  28 U.S.C. § 1961(a).[5]  Accordingly, the post-judgment interest is approximately 3.85%.[6]  [Agreed]

## III.    CONCLUSION

Based on the foregoing, the Court finds as follows:

1.    Plaintiff has proved its claim for negligence against FDDA by a preponderance of the evidence and is entitled to damages;

2.    Plaintiff is entitled to damages of $10,000.62;

3.    Plaintiff is further entitled to pre-judgment interest at the rate of 6.29% from August 24, 2018, to the date preceding entry of judgment; and

4.    Plaintiff is entitled to post-judgment interest at the federal rate of 3.85% from the date of entry of judgment until paid.

The Court will enter a separate final judgment to this effect.

It is SO ORDERED.

---

[5]    *See Selected Interest Rates (Daily) – H.15,* Bd. Governors of the Fed. Rsrv. Sys., https://www.federalreserve.gov/releases/h15/.

[6]    *See* United States District & Bankruptcy Court, Southern District of Texas, Post-Judgment Interest Rates – 2025, https://www.txs.uscourts.gov/page/post-judgment-interest-rates-2025.

Signed on September 3, 2025.

_____

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**